## THE RADNOR.

District Court, D. Maryland.     October 18, 1927.

No. 1530.

**1. Towage ⚖️4, 12(1)—Owner of tow is responsible for its seaworthiness, and owner of tug for its safe navigation.**

Where, under towage contract, tug has entire charge of navigation, owner of tow is responsible for its seaworthiness, and owner of tug for its safe navigation.

**2. Towage ⚖️4, 15(2)—Tug is not insurer; loss of tow raises no presumption of fault against tug.**

Towing tug is not insurer, but is only bound to exercise reasonable skill and care, and mere loss of tow raises no presumption of fault against the tug.

**3. Towage ⚖️15(2)—Tow, sinking under normal conditions, is presumed unseaworthy, unless mishandled.**

Tow is presumed to be unseaworthy when she sinks under normal conditions, in absence of proof that she was improperly handled.

**4. Towage ⚖️15(2)—Sinking of houseboat in tow held due to her unseaworthiness.**

Filling and sinking of houseboat while being towed in calm water *held* not due to any improper handling by the tug, but probably to opening of the seams of the boat, which had been moored in quiet water during the summer and had not been overhauled or recaulked within two years.

In Admiralty. Suit by J. T. Wright against the steam tug Radnor. Libel dismissed.

J. Morfit Mullen and Walter H. Buck, both of Baltimore, Md., for libelant.

France, McLanahan & Rouzer and J. Craig McLanahan, all of Baltimore, Md., for respondent.

COLEMAN, District Judge. The question involved in this case is the responsibility for the foundering of a tow. The material facts are, briefly stated, as follows:

The libelant, owner of the houseboat Manetta, on or about December 13, 1926, employed the steam tug Radnor to tow the houseboat from Baltimore harbor to the harbor of Easton, Md. In the course of the undertaking, the houseboat filled with water and was almost completely submerged, as a result of which the tug was unable to complete its undertaking and was compelled to put into the port of Annapolis, and there beach the houseboat. Damages are claimed in the amount of $2,249; $1,000 representing repairs to the houseboat, the balance damage to the houseboat's furniture and fittings. The trip, at the special request of libelant, was undertaken during the nighttime. There was very little wind and smooth water, with fog after the vessels got down the harbor. The houseboat was a converted scow, about 13 years old, 34 feet long, 18 feet beam, drawing about 2½ feet. The tug was one of the smaller types customarily used in this kind of service in and around Chesapeake Bay. The master of the tug requested libelant to remain aboard the houseboat during the voyage for her better protection; but he declined to do so, asserting, in effect, that there was no reason why she could not make the trip satisfactorily without any one on board of her, and that he preferred to stay on the tug during the trip, as he did.

The houseboat was towed in the following manner: A bridle was run through the hawse pipes in the bow of the houseboat, which were about 3½ feet above her water line, and was made fast to cleats in the hold of the boat, especially provided for such purpose. The bight of the bridle ran through a loop in the end of a 5½-inch hawser from the tug. At the start, and for some 25 minutes, until the boats were well down Baltimore harbor, about 10 fathoms of hawser were run out. Thereafter the length of line was increased; there is a conflict in the testimony as to how much. According to libelant's testimony, some 60 or 70 fathoms in all were used; whereas re-

spondent's testimony is to the effect that the maximum length of the hawser was not over 30 or 40 fathoms. It appears that nothing unusual happened until the tow line was lengthened, but at about that time the attention of those on board the tug, including libelant, was attracted by the fact that the lights, which had been placed upon the tow, seemed unusually low on the water, and that she was towing "hard." A fog had settled down, and it was difficult to distinguish the tow, although during the early part of the voyage visibility was good. No attempt was then made by those on board the tug further to ascertain whether there was anything wrong with the houseboat.

Libelant disclaimed any responsibility, and appears not to have been concerned at the time for her safety. However, a short while later, it became apparent that she was filling fast, with the result that the master altered his course, entered the Severn river with his tow and beached her off Annapolis. There she remained in a submerged condition for some six weeks, when libelant had her floated. No injuries to her hull were apparent; she appeared to be tight and otherwise seaworthy. There is no proof that she was towed carelessly or at an immoderate speed. It appears that, both before and after this foundering, she was towed in a similar manner, under similar weather conditions, without any mishap.

Libelant claims that the foundering was due to faulty navigation, for which the tug was entirely responsible; that this is a case of res ipsa loquitur. On behalf of the tug, full responsibility for proper navigation is admitted. The defense is made that this responsibility was fully met, but that the tow was delivered to it in an unseaworthy condition, which was the direct cause of the foundering, and that this could not have been prevented by those aboard the tug, after the houseboat's perilous situation was first discovered.

[1-3] The law governing such a situation is very clear. We start with the proposition: First, that where the owner of a tug contracts to transport a tow, and to take entire charge of its navigation, the owner of the tow is responsible for its seaworthiness, and the owner of the tug for its safe navigation. The Lizzie M. Walker (C. C. A.) 3 F.(2d) 921 (Fourth Circuit). Second, that a tug is not an insurer; that the mere loss of the tow raises no presumption of fault against the tug; that it is only bound to bring to the performance of its duty, reasonable skill, and care and such consideration as the special circumstances of the case demand; and that therefore the burden is upon the tow to show that the negligence of the tug caused the loss complained of. The Morning Star (D. C.) 10 F.(2d) 538, 1926 A. M. C. 132; Southgate v. Eastern Transportation Co. (C. C. A.) 21 F.(2d) 47; The Ashwaubemie (C. C. A.) 3 F.(2d) 782. Third, that a tow is presumed to be unseaworthy when she sinks under normal conditions, and in the absence of proof that she was improperly handled. The Senator Rice (D. C.) 15 F.(2d) 882; In re Young (D. C.) 162 F. 912; The Arctic Bird (D. C.) 109 F. 167.

[4] Applying the above principles to the facts in the present case, the conclusion is inescapable that the tow has not sustained the burden of proof imposed upon it, to establish negligence on the part of the tug. There is no affirmative proof whatsoever of such negligence, but merely a theory of the libelant that the towline was too long, as a result of which its excessive weight, dragging in the water, caused the houseboat to sink abnormally by the head, so that she took in water through her hawse pipes and over her deck. On the other hand, those in charge of the tug testified that the hawser was no longer than it was customary to use in such cases, and this evidence was further substantiated by that of the manager of the towing concern that operated the tug, and by others equally as qualified.

Libelant further claims that it was negligence per se for the master of the tug to remain passive after he had some foreboding that the tow was possibly in danger. Of course, it is true that, even though the tug was not originally at fault, it owed the duty to the tow to minimize any danger as much as possible. However, under the view which the court takes of the case as to the real cause of the foundering, it is difficult to see how those on board the tug could have in any way remedied the situation by doing anything more. The court believes that the houseboat sank because she was unseaworthy with respect to her seams. No survey was made of her, and it, no doubt, would have been helpful, had one been made. The only evidence bearing on the seaworthiness of the houseboat, which is not based upon mere theorizing, is that of libelant himself, which, summarized, amounts simply to this: That he had owned her for over 2 years and had never known her to leak. On the other hand, we have his own statement that he had never had her caulked or her hull overhauled since he owned her; that for some 14 months (including

therefore, the hot weather of the summer), just preceding the accident, she had been moored in the same place, in relatively quiet water, and that the only examination that he made of her hull, to see whether her caulking was still fit, before the towing commenced, was to run his pocketknife around her seams. Such lack of overhauling over such a period of time seems of itself to imply negligence on the part of libelant, and to create a presumption of unseaworthiness.

It is a fact, generally admitted, that it is a risk not to overhaul and recaulk all wooden craft each season. The testimony of respondent, introduced through a number of experienced and highly responsible witnesses, is to the effect that, when the top sides of a boat of this type are not brought into contact with water over a period as great as 14 months, it is virtually inevitable that the planking will contract, causing her seams to open. As was testified by Mr. Addison, president of the Spedden Shipbuilding Company, even if the bow wave, created by the towing of the houseboat, would normally reach only the first seam in her bow above her water line, if that seam were open, enough water would soon enter and cause her to sink by the head, whereby other open seams would be submerged, and it would only be a matter of a short time before she would founder. This explanation of the cause of the foundering, which the court believes to be the correct one, is really corroborated, rather than contradicted, by the testimony that, although the houseboat was allowed to remain submerged at Annapolis for some 6 weeks, when she was floated and entirely pumped out she remained tight and staunch. The wooden hull, after such long submergence, would naturally swell to a large extent, and it would take considerable exposure again to warm weather and dryness before the seams would reopen.

The only question remaining to be considered is: Could those on board the tug, by the exercise of reasonable care and diligence, have prevented, or minimized the filling of the houseboat through these leaky seams? The court finds no evidence in the case sufficient to support the claim that they could. Assuming that the towing had been immediately stopped at the first intimation of trouble, and that the tug had forthwith been placed alongside the houseboat, what could have been done? There is no evidence that those in charge of the tug knew or should have known, in the fog, of the peril of the tow until she had taken in a great deal of water. Possibly even then she might have been kept from further submergence by the use of a pump on the tug, but there is no evidence that such was aboard, nor is negligence to be presumed from its absence, any more than from the failure to have left some one on the tow from the start. These considerations bring us into a field of mere speculation, not supported by the evidence; so it is idle to surmise what might have been done, were the facts otherwise than have been shown. It is not without some significance that the weight of the evidence is to the effect that the libelant, who testified he had followed the water for many years, and had had a pilot's license, first class, and who therefore would be expected to be solicitous for the welfare of his craft, saw as much of the impending peril as soon as those in charge of the tug did, but did not then criticize their lack of effort, which is now complained of.

The libel is therefore dismissed.