## O'BOYLE v. UNITED STATES.
### No. 139.

Circuit Court of Appeals, Second Circuit.

Feb. 16, 1931.

Macklin, Brown, Lenahan & Speer, of New York City (Horace L. Cheyney, of New York City, of counsel), for appellant.

Howard W. Ameli, U. S. Atty., of Brooklyn, N. Y. (Herbert H. Kellogg and Alfred C. McKenzie, Asst. U. S. Attys., both of Brooklyn, N. Y., of counsel), for the United States.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

This action was brought to recover damages sustained by Anthony O'Boyle, owner of the coal boat Hattie, while under a demise charter to the defendant. The charter party was made to the United States through the agency of the War Department, and provided: "That the boat will be returned * * * in the same condition as received except as deteriorated by ordinary wear and tear, the act of God, or by any person or agency for whose acts and negligence the United States is not responsible. * * *" The barge was delivered to the defendant on April 11, 1920.

The plaintiff introduced evidence to the effect that the Hattie had been in dry dock in February, 1920, and that from February 11th to 28th she was chartered to Cullen Transportation Company, from March 3d to 23d, she was chartered to Craig Transportation Com-

pany, and from March 23d to April 6th, she was chartered to Low Transportation Company. Plaintiff's testimony also indicated that between February 11th and the time when she was chartered to the government the Hattie had been used for carrying bituminous and anthracite coal, with a bargee in charge, and that no report had been made to the owner of any leakage or unseaworthiness.

When the barge was chartered to the government, she lay at Arlington, N. J. On June 15, 1920, she was towed to Constable Hook, where she took on 500 tons of coal on June 16th. The owner placed a bargee named O'Brien on her on May 29, 1920. He testified that on the morning of June 16th, when it was proposed to load the barge with coal, he called up the owner, who advised him that she might be loaded with 500 tons. After she took on a load of that amount, she began to leak. The bargee used the gasoline pump with which the boat was furnished for about half an hour, but found the water gaining, and telephoned to the government fuel inspector at Constable Hook for a tug, which came equipped with a three-inch siphon. This was put into the barge and reduced the water in the hold from 3½ to 1½ feet. This government tug was assisted by another tug sent, at the request of the bargee, by the defendant. The first tug attached a hawser to the barge to tow her to her dock at Hoboken and turned over the siphon to the second tug, which had the barge alongside and used the siphon to pump the water from her hold as she was towed toward Pier 5, Hoboken, a distance of about 4½ miles.

At the time the fuel inspector got the call for a tug, at the request of the bargee, he telephoned the owner that the barge was leaking, who sent one Murphy from his office to look into conditions. Murphy boarded the barge and accompanied her on her journey. Both the bargee and Murphy thought that the siphon would keep the water down and neither regarded the barge as likely to sink, or objected to her being towed to Hoboken. The bargee testified that the loading was properly done and that the barge when fully loaded would carry 600 tons.

When the barge, under its convoy, had almost reached her destination, she filled and sank. The defendant employed the Merritt & Chapman Derrick & Wrecking Company to raise her and became indebted to it for salvage expenses in amount of $4,067.50.

The District Court, holding that the damage to the barge was due to her initial unseaworthiness, dismissed the complaint, and directed judgment for $4,067.50, for the defendant on its counterclaim, which was based on the cost of salvaging the barge and her cargo.

The question before us is whether under the terms of the charter party the defendant has shown any excuse for failing to return the barge "in the same condition as received." The testimony indicates that she was in dry dock in February, 1920, and that she carried coal for intervening charterers without any complaint as to her condition. The defendant made no attempt to account for her or to show that she suffered no strains or injury during the seven weeks while she was in its hands prior to May 29th, when O'Brien was placed on board as bargee. There was some testimony to the effect that her seams dried out and she began to leak when subjected to a heavy load and the strain of towing because she had laid light for a considerable period before the coal was put on board. But, if this were so, it would not prove unseaworthiness when the charter was entered into. Indeed it would be something for which the defendant might be responsible. The case comes down to this: The barge was old, yet apparently seaworthy, at the time she was chartered. More than two months afterwards she leaked and sank while in possession and under the control of the charterer. In such circumstances, the latter had the duty of offering evidence to show that the barge was properly cared for while in its hands, or met with some strain, not due to its neglect, which caused her to leak.

The bargee O'Brien testified that she met with no accident while he was on board, but that left her use or misuse for the seven weeks preceding May 29th wholly unaccounted for. So even if we reject the testimony of Murphy, who said that he examined the barge at the time O'Brien went on board and found her planking and seams in good condition, there is still evidence that she was initially seaworthy and sank when in the possession of the charterer without any explanation as to what happened to her during the greater portion of the charter term. Not only is the failure to turn over the barge "in the same condition as received," according to agreement, not excused by any proof of unseaworthiness when chartered, but the presumption of negligence, arising from the foundering of an initially seaworthy vessel, is not met. The Sundial (C. C. A.) 43 F. (2d) 700.

In view of the dry-docking in February and the apparently successful carriage of coal by intervening charterers, the mere fact that

the Hattie was an old barge and began to leak two months after the charter began, was not enough to indicate initial unseaworthiness. She doubtless was unseaworthy on June 16th, but there was no implied warranty that she would remain seaworthy during her charter term. The Ice King (C. C. A.) 261 F. 897.

The judgment is reversed.