## THE FRANCIS V. DUFFY.

### SHAMROCK TOWING CO., Inc., v. CITY OF NEW YORK.

#### No. A–15632.

District Court, E. D. New York.

April 19, 1940.

Alexander, Ash & Jones, of New York City (Edward Ash, of New York City, of counsel), for libelant.

William C. Chanler, Corp. Counsel, of New York City (George Seagrave Franklin, of New York City, of counsel), for City of New York.

BYERS, District Judge.

The libelant's deck scow Francis V. Duffy, having been loaded with about 1,-264 cubic yards (estimated at about 624 tons) of refuse, capsized and sank at the 54th Street dump (Manhattan) at about 3 p. m. on February 3, 1939.

This decision is necessary in order to fix liability for the occurrence.

There was no collision, nor wind-storm, to account for the happening. Whether the load split to indicate improper distribution of weight during the loading operation which was conducted for the respondent by a private concessionaire, was not shown, for the City's foreman, who observed the capsizing, was not in a position to see.

Under these circumstances, a satisfactory explanation is a difficult thing to arrive at.

The hiring was the customary one between the City and the owner, at a daily rate, with the latter furnishing a scow captain, and the former assuming responsibility for the negligence of its own employees and agents.

Delivery in good condition is conceded, and an inspection by the foreman at the dump on February 2nd revealed "no new damage" and the scow was believed to be in customary good condition for service. Constant employment is shown from January 1, 1938, to the day in question, according to respondent's Exhibit C, and the evidence was that, for above two years prior thereto, the Duffy had been so engaged, except as she was out of service for needed repairs; as lately as January 15, 1938, $1,245.77 had been spent on her, and in November of 1936, $3,609.44. So that, while her age was uncertain, her condition on February 2, 1939, is not shown to have been other than adequate.

The fact of damage having been agreed to, the respondent frankly admitted prima facie cause, and proceeded to go forward with proof that the damage was not due to lack of care on its part. Kenny v. City of New York, 2 Cir., 108 F.2d 958.

It is argued by the City that the evidence demonstrates unseaworthiness as follows:

(a) That the scow leaked.

There is no such testimony. Dublynn, the foreman who made inspection on the day prior to the capsizing, and before loading began, went down into the hold, using a flashlight; he said he was satisfied that the boat was in good condition, and the only water was "just enough where the pump couldn't pick it up"—as is customary. It was all right to load or he wouldn't have done (permitted) it. He saw a certain amount of water seeping through the deck planks; this was before loading, and while it was raining. He described it as "a little seepage through the decks".

As to the rain, the weather report in evidence for February 3rd shows total

precipitation to midnight of .16 inches and .1 inches of snow.

(b) Structural defects, i. e., "soft" patches (outboard).

Such indeed were spoken of as seam covers, on end planks to keep oakum in place. As to that, they were adequate, because Burke, libelant's treasurer, whose testimony is cited by the City on this subject, said: "* * * the caulking hadn't come through, and the caulked edges on the inside were all right".

Rabel for the City did not contradict the foregoing, although he observed the soft patches on November 24, 1936.

Neither leaking nor unseaworthiness was traced to these patches.

(c) The bottom had not been caulked during the libelant's ownership of the scow, dating from 1927.

Such indeed was the testimony, but even if Rabel is right in saying that bottom caulking should be done once in six years, there is no proof that the Duffy leaked. Rabel made the into-service survey on November 24, 1936, and he did not find any reason to reject for City service, nor did he recommend that the scow be drydocked to try her bottom caulking; moreover, he examined her several times afloat, between that time and February 3, 1939, and made no report concerning her to his superiors.

The City relies on The Emergency, D. C., 9 F.Supp. 484, 485, to establish unseaworthiness because of the failure to show bottom caulking for the twelve years of libelant's ownership. In that case, it is said that the weight of the testimony "* * was that the oakum there [below the light water line] was soft and badly deteriorated, as well as slack in many places". There is no such testimony here. The survey of February 7, 1939, calls for four new port side bottom planks; caulking as follows: both *sides,* 28 5-foot scarfs including nibs to be caulked, also rake seams both sides, both ends. The only other caulking required is at wearing pieces.

To say that this case presents any affirmative evidence that there was leaking below the light water line because of faulty caulking would be to import an opinion not based upon the evidence.

(d) Her main gasoline pump was defective.

The scow master testified that he used that pump on the night of February 2nd, from 8 until 9:30, when his boat was dry. The next day, he tried to use it again, but it would not work: "A little drop, a little snow, a drop of water in the magneto, and it don't work no more." There is no testimony to support a finding of unseaworthiness by reason of that development.

He then used his hand pump, and his testimony is:

"Q. Why did you stop pumping? A. As long as I have water in, I pump, there is not so much water, about a foot; when I see she is going over, I jump, and up she goes; when I look this way, she is over already."

So far as unseaworthiness is concerned, the evidence does not justify a finding that it has been established by affirmative proof.

Other cases cited by respondent are:

Dutton No. 6, D.C., 9 F.Supp. 233, 1934 A.M.C. 1403: Here there were loose uncaulked boards in the forward deck which, in the absence of longitudinal bulkhead, enabled water to enter the hold, on a trip in Long Island Sound, causing a list, which resulted in the capsizing.

The Radnor, D.C., 21 F.2d 982: Not in point, because no evidence as to continuous service of the house-boat which capsized; the court concluded that her seams must have opened during immediately prior period of disuse.

The Sea Lion, D.C., 12 F.2d 124: Facts too remote to be helpful.

The Jungshoved, 2 Cir., 290 F. 733: The lighter Crown sank in her slip, which raised a presumption of unseaworthiness, which is rebuttable, but was not met.

It is here deemed that the mere presumption does not make out the respondent's cause.

The Calvert, 4 Cir., 51 F.2d 494: Too remote as to the facts, to be of assistance.

T. N. No. 73, 1939, A.M.C. 673: So far as applicable, this case is to the general effect that such an unexplained sinking creates a presumption of unseaworthiness.

Under the authorities relied upon, the law is deemed to be that the Duffy must be presumed to have been unseaworthy when the capsizing occurred, although no specific evidence thereof has been adduced.

That does not establish the respondent's cause, however, unless the proof is that,

while under charter, the scow was properly cared for, since unseaworthiness has not been shown, nor is it even under suspicion prior to February 3, 1939. See O'Boyle v. United States, 2 Cir., 47 F.2d 585.

The proof as to the loading is conflicting, and may be read in favor of either litigant. The City asserts that there was no rubbish, i. e., loose and general waste matter—some of it light—forming a part of this stow; that only residue from an incinerator (440 cubic yards), being a semi-fluid mass, and ashes (824 cubic yards) were loaded on the Duffy, the former constituting the bottom layer.

The importance of that lies in the tendency of a load to shift, if part of it is rubbish stowed at the bottom, and the heavier substances are placed on top.

The scow master said that rubbish was stowed first, and residue put on top, and that there were no ashes. The City witnesses denied this, and gave the figures which have been quoted.

Brama, an employee of the Supervisor of New York Harbor, a federal employee concerned with harbor pollution, saw the Duffy, bottom up, in the slip, just after capsizing. He was asked:

"Q. What did you see? A. I saw the slip full of refuse material floating out in the fairway in the river.

"Q. Rubbish? A. All kinds."

He did not make a special trip for this observation, but happened to be on a regular tour of inspection.

That disinterested testimony is relied upon to corroborate the scow master's testimony, and to demonstrate that the loading was pretty much of the character that he described. This means that as residue, and perhaps ashes, were added to the rubbish, the load became uneven, and caused the scow to list.

There was some water below, as the scow master testified, but when he reported to the foreman Dublynn, in the morning of February 3rd, and after the loading had been finished at about 9:30 o'clock (and the scow had been moved to the outer end of the dump pier), it was the list that alarmed him, and not such water as was then in the hold.

Dublynn did not deny this testimony directly, but did say that the scow master reported a list to him at 1:35 to 1:40 o'clock in the afternoon. He went aboard the scow, and found about ten inches of water in the hold. He procured a siphon, and the scow master helped him put it in place.

There is an interval of one hour and twenty minutes not accounted for, in this or any other part of the record, nor is there a direct statement that the siphon failed to function. There is a note read into the record by Dublynn: "* * * placed siphon in same but did not have time to siphon out scow as sudden list to port side caused scow to turn upside."

Elsewhere it appears that the owner's office was from 500 to 1,000 feet from this slip and could have been reached by telephone in the office on the pier. As between the scow master who was trying to clear the hold of such water as was there, and the City employees who were notified of the apprehensions of the scow master, it is thought that the duty of reporting to the owner could have been the more easily performed by the respondent. The fact that no notice was given to the owner is compatible with a recognition that perhaps the loading had not been as symmetrical an operation as Santigata, the refuse contractor's trimmer, said that he observed it to be.

Since the City undertook to siphon out the scow, it is not clear why the operation was not prosecuted. There was better than an hour available for the purpose, and yet nothing was actually done in that behalf, or by way of disposing the load so as to establish an even trim.

The only misgiving that survives a consideration of the testimony results from the fact that there was a seepage of water through some parts of the deck, as observed below, before stowage began on February 2nd, during the rainfall of that day. Obviously a continuation of that condition of weather, plus the expectable seepage from the semi-fluid incinerator residue, would mean some accumulation of water in the hold by the time loading should have been completed.

That is not shown to have been a new development, for the report was, "no new damage", and presumably unseaworthiness cannot be predicated of that condition of the decks. The latter had been caulked on November 24, 1936, as part of the $3,609.-44 repair job. Such seepage as was observed through the decks indicated the necessity for either stowing only a light

level load, or rejecting the scow for service, under the existing weather conditions.

Upon the case as a whole, the conclusion is that the respondent has not gone forward with sufficient or convincing proof to rebut the libelant's prima facie cause.

The evidence may be summarized as follows:

A.  The Francis V. Duffy was not unseaworthy as a matter of fact on February 3, 1939.

B.  If unseaworthiness is to be presumed, the presumption is deemed to have been rebutted by the testimony in the case as a whole.

C.  The City has not sustained its burden of evidence.

### Conclusion of Law.

The libelant is entitled to the usual decree with costs, to be settled. If more detailed findings are desired, they may be settled at the same time.