**SOUTHERN LIGHTERAGE CORP. v. The J. ALVAH CLARK et al.**

No. 7465.

United States District Court
E. D. Virginia, Norfolk Division.

April 2, 1952.

Baird, White & Lanning, Norfolk, Va., for libelant.

John W. Oast, Jr., Norfolk, Va., for respondent.

BRYAN, District Judge.

The scow Covered Wagon capsized on May 3, 1951, in the James River, near buoy 10, while in the tow of the tug J. Alvah Clark, and her owner has here libeled the tug to recover damages for the scow and her cargo. The question is whether the tug failed to exercise reasonable and ordinary care for the safekeeping of her tow.

On the previous day, at Dutch Gap on the upper James, the Clark had picked up five unmanned scows of the libelant, each loaded with sand, rock or gravel, for hauling downriver to Norfolk, Virginia. The scows were of the square-end type, with a slightly raked hull and with two forward and two aft hatches opening down into her bilges. Each scow was approximately 113 feet long, 30 feet wide and 9 feet in depth. Libelant had loaded the scows, and had made up the tow, in tandem and coupled at 4 feet, with the Covered Wagon the second in line. The Clark was an oil screw, 90 feet long, 19 feet wide, 10 feet deep and was towing on a hawser of 400 feet.

Departing at 7 o'clock p. m. on May 2, 1951, nothing untoward happened until 5:30 in the afternoon of the next day when the first mate noticed a severe list in the Covered Wagon on her starboard side forward, leaving a freeboard there of only 10 inches. As the master of the Clark was then coming up for his trick at the wheel, his attention was directed to the condition of the Covered Wagon. Immediately he brought the tug about to attend the scow.

The master, chief engineer and others boarded the Covered Wagon, found she was fast taking water through her seams, and set a pump to work against the leak. It was raining, and after starting the pump, the crew members reboarded the tug and she returned to her place at the head of the flotilla to continue her trip. A sudden and heavier rain fell just then and the pump stopped.

Whereupon the tug again came about to go to the crippled scow. Before reaching her the tug's propeller fouled the tow line, but with the aid of another vessel in the vicinity she reached the Covered Wagon. The pump was restarted and, as the Clark was still without power, her master called her sister tug, the Dixie, for assistance. The latter arrived in about 30 minutes and put another pump aboard the lighter, but almost immediately the scow overturned. After marking the scow with an appropriate light, the Dixie took in tow the remainder of the flotilla, with the Clark also in line, and brought them to their destination.

Unfaithful stewardship of the tow by the tug before discovery of her list has not been proved. Inference of neglect from failure to ascertain her condition earlier is the only evidence on the point and it has not been sustained. Constant surveillance of the flotilla since commencement of the passage is affirmatively vouched by the first mate, a seasoned waterman. If judged by the events of her last hours, the Covered Wagon's disability was acute and rapidly progressive. No one could say for how long she had exhibited her distress and, hence, how much sooner it could have been turned up. Second in line on a short coupling, she was obscured from the tug by the hull as well as by the peaking of the lead-scow's cargo. However, in the bends of the river, and by maneuvers of the tug, she was regularly observed. Want of watchfulness in the tug is not fairly inferable and has not otherwise been proved.

But the tug plainly defaulted in her duty after she discovered the precarious condi-

tion of the Covered Wagon. Clear and imminent was the danger of losing her. Her voyage must be ended at once unless her trim could be improved promptly. It was not enough simply to hold the leak. By now she had only an 8-inch freeboard at her forward starboard corner—all that remained of an original freeboard of 3 feet 6 inches. Further forward movement of the Covered Wagon was arrant folly, especially as the losing freeboard was at her leading edge, the tide was setting in and the wind was also adverse. Already her cargo of gravel was slowly trickling overboard.

Oblivious or heedless of her peril, the tug-master tarried but a few minutes on the scow after starting the pump, although he and his crew could hear the water streaming into her bilges. Before leaving to resume the towing, he was not assured that the pump would gain on the leak or even stay it. No one was left to attend it, though its cessation was to be expected momentarily in such weather and from common experience with pumps. Thus he omitted even the simplest precautions to preserve the scow. But his attempt to tow her then was downright wanton.

If the pumping was not effectual, then good seamanship insisted that the scow be beached. Shoals and shores were close at hand. There was ample time. To cut the Covered Wagon out of the flotilla was not a difficult task. Scattering or drifting of the other scows was scarcely a problem or could have easily been controlled by mooring them. Had the Covered Wagon been shored she would have been saved.

The Clark failed in her obligation to devote reasonable care [1] to the protection of the Covered Wagon—to prevent her from foundering. That fault was the proximate cause of the loss. The unseaworthiness of the scow, presumed [2] from her quick flooding, was not a concurring or contributing proximate cause of the capsizing. It was related, but only antecedently. True, the scow's jeopardy was created by her own infirmity, but there was ample opportunity for the tugmaster to forestall the actual disaster. Consequently, the Court does not consider, and the respondents have not suggested, that the loss should be divided upon the ground of common fault.[3]

A decree now will fix liability on the tug, and unless the parties agree upon the amount of damages within 30 days, inquiry thereon will be made through a master. This memorandum will be adopted by the Court as its findings of fact and conclusions of law.

1. The Director, 4 Cir., 21 F.2d 47, 29; The Radnor, D.C.Md., 21 F.2d 982, 983.

2. The Radnor, supra, D.C., 21 F.2d 982, 983.

3. Henry DuBois Sons v. Penn. R. R., 2 Cir., 47 F.2d 172, 174; The Perth Amboy, 2 Cir., 135 F.2d 404.