**LOUISIANA MATERIALS CO., Inc.**

v.

**ROYAL PELLEGRIN d/b/a Montegut Towing Co.**

and

**TUG JMJ in rem.**

**No. 3966.**

United States District Court
E. D. Louisiana,
New Orleans Division.

Nov. 20, 1962.

J. Y. Gilmore, Jr., Faris, Leake & Emmett, New Orleans, La., for libelant.

John Poitevent, Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., for respondent.

WEST, District Judge.

Libelant's Barge KE 16 was damaged and her cargo lost while in tow by the Tug JMJ and libelant has brought this action against the tug and its owner. The issues of fact and law having come on to be heard on the pleadings and proofs of the parties, the Court now makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

1.

The Barge KE 16 is a flat-deck, steel-hulled, unmanned barge about 170 feet in length, 35 feet in width, and 9.6 feet in depth. Her ends are raked. She was built in 1941 and purchased by libelant in 1957. At all times pertinent hereto both the barge and her cargo of about 900 cubic yards of shell were owned by libelant.

2.

The Tug JMJ is a steel-hulled tug of 600 horsepower, about 60 feet long, with a 19 foot beam, drawing 7 or 8 feet of

water. At all times pertinent hereto, she was owned by respondent, Royal Pellegrin, d/b/a Montegut Towing Company.

**3.**

On December 14, 1958, at about 3:30 o'clock p. m., the Tug JMJ, manned by Captain Leroy J. Charpentier, a mate and a deckhand, took the KE 16 in tow at libelant's spot dump, known as the Steven's Yard, located alongside the Industrial Canal in New Orleans, Louisiana. When taken in tow, the KE 16 was fully loaded with about 900 cubic yards of shell, which covered the deck, including all of the twelve manholes, or hatch openings. She had about 18 inches of freeboard at that time.

**4.**

When taken in tow by the Tug JMJ, the KE 16 had a noticeable list to port, but the amount of the list was not unusual for barges of this type when fully loaded with shell.

**5.**

At about 4:15 o'clock p. m. on December 14, 1958, the Tug JMJ, pushing ahead the loaded KE 16, departed Steven's Yard bound for another one of libelant's spot dumps located at Southport, Louisiana, on the east bank of the Mississippi River. (Mile 104.5 A.H.P.)

**6.**

At about 5:30 o'clock p. m. the JMJ and her tow arrived at the Industrial Canal lock, operated by the United States Corps of Engineers, and cleared the lock at 7:45 o'clock p. m. The KE 16 was listing to port at that time to about the same extent as when she was taken in tow, but the list was not considered unusual and she was cleared through the lock without objection or incident.

**7.**

After proceeding up river to a point known as Six Mile Point, or Greenville Bend (Mile 101.5 A.H.P.), which point is about 3 miles due south of libelant's Southport spot dump, the JMJ and her tow encountered northerly winds of 13 to 15 m. p. h. This was at about 9:30

o'clock p. m. At about this time Captain Charpentier, of the JMJ, put his spotlight on the KE 16 and observed that the list of the barge to port had increased and she was taking water over her deck. He observed that the cargo of shell seemed to be settling on the port side of the barge.

**8.**

The tug and her tow had been proceeding up river at about 4 miles per hour over the ground and when the captain of the JMJ noticed the increase in the list to port of the barge at about 9:30 o'clock p. m., he reduced his speed to one-half, in order to reduce the amount of water washing over the deck of the barge. At the same time he contacted either Mr. Clay Calhoun or a Mr. Eaton, both officers or employees of libelant company, by marine radio, and notified them that the KE 16 was listing badly and in danger of sinking. He was instructed to proceed and to beach the KE 16 at Southport if possible.

**9.**

The JMJ continued with the KE 16 in tow and arrived at Southport at about 10:25 o'clock p. m. The deck of the KE 16 was awash at that time, but very little if any of the cargo had been lost. Captain Charpentier then proceeded to beach the barge at Southport. Then, upon instructions from Mr. Calhoun, the JMJ stood by the KE 16 pushing against it to keep it against the shore and to prevent it from sliding out into deeper water until about 5:30 o'clock p. m. the following day, December 15, 1958, or for a period of approximately 17 hours. Mr. Calhoun arrived at the scene of the beaching some time after daybreak on the morning of December 15, 1958.

**10.**

The JMJ stood by the beached KE 16 until told to leave by libelant, and thereafter salvage operations began. While some of the cargo was probably lost as the deck of the KE 16 became awash before reaching Southport, nevertheless, for all intents and purposes, the bulk of

the cargo was lost after the barge was beached and either just prior to or during salvage operations.

**11.**

The KE 16 had twelve manholes or hatch openings in her deck. These openings, instead of being covered with metal, watertight covers, were merely covered with either boards, roofing paper, or rubber sheeting. The shell cargo was then loaded in such a manner as to cover these hatch openings and their covers. These improvised hatch covers or manhole covers were not water-tight, and consequently, when the waves broke over the deck of the barge, it is quite conceivable that water could penetrate below the deck and cause the barge to list and ultimately sink. There was also sufficient evidence to warrant the conclusion that the main deck of the KE 16 had other holes in it sufficient to prevent it from being water-tight.

**12.**

There was absolutely no evidence to indicate that any less damage would have resulted had Captain Charpentier beached the KE 16 immediately at Greenville Bend instead of proceeding to Southport before beaching her there. The cargo was still essentially intact when she reached Southport, and there was no evidence of any greater damage having been sustained by the KE 16 by virtue of the trip from Greenville Bend to Southport. The damage to the KE 16 and her cargo occurred during or after the beaching at Southport.

**CONCLUSIONS OF LAW**

**1.**

■ The subject matter of this litigation, a cause of negligent towage, is within the admiralty and maritime jurisdiction of this Court, and venue is properly laid in the Eastern District of Louisiana. 28 U.S.C. § 1333.

**2.**

■ The law is well settled that a towing vessel is not liable as an insurer of its tow or as a common carrier. When damage or loss occurs to the tow, if libelant is to recover, he must carry the burden of proving negligence on the part of the towing vessel by a preponderance of the evidence. Stall & McDermott v. The Southern Cross, 5 Cir., 196 F.2d 309; W. Horace Williams Co. v. The Wakulla, D.C., 109 F.Supp. 698.

**3.**

■ Even in the case where the doctrine of res ipsa loquitur applies, it is but an aid to the libelant in carrying his burden of proving a breach of duty of care on the part of the towing vessel and her crew, and it does not avoid the requirement that, upon the whole case, the libelant must still prove his case by a preponderance of the evidence. Commercial Molasses Corporation v. New York Tank Barge Corporation, 314 U.S. 104, 62 S.Ct. 156, 86 L.Ed. 89; Ayres Marine Service v. W. Horace Williams Company, 5 Cir., 213 F.2d 27.

**4.**

■■ In any event, in this case, the Court finds as a matter of law that the doctrine of res ipsa loquitur does not apply as, from the evidence adduced on the trial of the case, and from the facts as found by the Court, there are certainly other hypotheses upon which the cause of the damage here can rest aside from any negligence on the part of the towing vessel. Indeed, the evidence makes it clear that the damage here complained of could have occurred without any negligence whatsoever on the part of the JMJ. Moreover, for res ipsa loquitur to apply, libelant would have to show that the damage complained of could not have occurred in the absence of negligence on the part of the towing vessel, and that the KE 16 was seaworthy when delivered to the JMJ. This libelant has failed to do. Frederick Snare Corp. v. Moran Towing & Transportation Co., D.C., 195 F.Supp. 639.

**5.**

■ The law governing cases of this kind is well settled. In a contract

of towage, the owner of the tow or barge is responsible for the seaworthiness of his vessel, and the owner of the tug or towing vessel is responsible for its safe navigation. While the owner of the tug is not an insurer of his tow, he is obligated to perform his work in a reasonable and prudent manner, using such care and skill as prudent navigators usually employ in similar situations. Curtis Bay Towing Company of Virginia, Inc. v. Southern Lighterage Corporation, 4 Cir., 200 F.2d 33. In Curtis, supra, it was found by the Court that the tug master was negligent in not beaching his tow when he discovered it was leaking and listing badly. His failure to beach the tow caused it to sink. In the instant case, no such findings are justified. While it is true that the captain of the JMJ proceeded up river some two or three miles after he was aware that the Barge KE 16 was in danger of sinking, nevertheless, there is no showing that this delay in beaching the KE 16 had the remotest connection with the ultimate damage to the barge and the loss of her cargo. The KE 16 was beached before she ultimately sank and it was not until the following day, some 17 hours later, either during salvage operations or just prior thereto, that the actual loss and damage occurred. Thus it is concluded that the captain of the JMJ did exercise the required care and maritime skill required of a prudent navigator and that libelant has not carried the burden of proving by a preponderance of the evidence that the captain or crew of the JMJ were guilty of any negligence whatsoever causing the loss and damage complained of.

6.

It is well-established law that a tow is presumed to be unseaworthy when she sinks under normal conditions and in the absence of proof that she was improperly handled. The Senator Rice, 2 Cir., 15 F.2d 882; Southern Lighterage Corporation v. The J. Alvah Clark, D.C., 103 F.Supp. 580; Metropolitan Coal Co. v. Howard, 2 Cir., 155 F.2d 780. That principle of law is applicable here. There was no proof that the KE 16, while in tow by the JMJ, was improperly handled. There was no proof that abnormal or unusual conditions existed during the time the KE 16 was in tow by the JMJ. Consequently, the fact that the KE 16 took on water requiring her to be beached, and ultimately, after beaching, capsized and sank, raises a presumption that she was unseaworthy. Libelant has not only failed to prove negligence, but also failed to prove that it offered a seaworthy barge for towage. Frederick Snare Corp. v. Moran Towing & Transportation Co., supra. In addition to this presumption, the evidence concerning the lack of water-tight manhole covers or hatch covers on the KE 16 further supports the finding of unseaworthiness. When she was taken in tow by the JMJ, these openings, with wood or tar paper or rubber sheeting coverings, were covered over by the cargo of shell. The condition of the hatch covers was apparently such as to allow the barge to take on water should waves break over the deck and cargo. Because of the fact that the cargo covered the hatch openings, the condition of the hatch covers could not have been obvious to the captain of the JMJ, and thus, he is absolved from responsibility for damage or loss therefrom. Frederick Snare Corp. v. Moran Towing & Transportation Co., supra.

7.

Thus, the libelant having failed to prove any negligence on the part of the towing vessel or her crew, and further, having failed to rebut the presumption of unseaworthiness of the barge KE 16, may not prevail in its claim for damages herein.

Decree accordingly.