CARIBBEAN TOWING CO., Libelant,

v.

The S. S. JOHN W. CULLEN her engines, tackle & appurtenances, etc., and Southern Scrap Material Co., Ltd. and Triple "C" Boats, Inc., Respondents.

No. 5759.

United States District Court
E. D. Louisiana,
New Orleans Division.

Feb. 26, 1968.

Joseph W. Nelkin, New Orleans, La., for libelant.

J. Y. Gilmore, Jr., New Orleans, La., for Southern Scrap Material Co., Ltd.

John T. Cooper, New Orleans, La., for Triple "C" Boats, Inc.

CASSIBRY, District Judge:

C. J. Boyne, Edward J. Boyne and F. W. Lasseigne, doing business as Caribbean Towing Company, a partnership (Caribbean Towing), filed this action as owners of the Tug Caribbean (Caribbean) against the S.S. John W. Cullen (Cullen), *in rem*, and *in personam* against its owner, Southern Scrap Material Co., Ltd. (Southern), and against Triple "C" Boats, Inc., (Triple "C"), seeking recovery for services rendered by Caribbean Towing's tugboat, the Caribbean. Southern claimed the Cullen, answered the suit of Caribbean Towing, and filed a cross-complaint against Triple "C" for damages allegedly incurred in the stranding and subsequent salvage of the Cullen. Triple "C" answered the complaint of Caribbean Towing, filed a petition of impleader against Southern for the use of the Caribbean, answered the cross-complaint of Southern and filed a cross-complaint against Caribbean Towing for indemnification relative to the cross-complaint of Southern. Subsequently, each party claimed against all others for indemnification except that Southern made no direct claim against Caribbean Towing for damages.

Cullen, a liberty ship, was purchased by Southern to be scrapped, and was to be hauled as a dead ship from storage at Beaumont, Texas to New Orleans, Louisiana.

On January 17, 1963 Southern contracted in writing with Triple "C" for this towage. The contract, which was prepared by Southern, described the Caribbean in detail and stipulated that a fee in the amount of Five Thousand One Hundred and No/100 ($5,100.00) Dollars would be paid on completion and that if the tow was lost, tower would be paid at a daily rate of Seven Hundred Fifty and No/100 ($750.00) Dollars after being discharged until tower returned to her home port.[1] The Court concludes that Southern was fully aware at the time the contract was consummated that Triple "C" did not own the Caribbean.

Triple "C" in turn contracted with Caribbean Towing, the owners of the Caribbean, for the use of the Caribbean, to tow the Cullen from Beaumont to New Orleans. The agreed upon price was Four Hundred Eighty and No/100 ($480.00) Dollars per day, but in no event less than Three Thousand Five Hundred and No/100 ($3,500.00) Dollars. This agreement was never reduced to writing.

The primary issue in this case is whether Caribbean Towing and Triple "C" can recover towage fees from Southern even though the tow was "lost" twice due to high winds and heavy seas and was never delivered in New Orleans by Caribbean Towing or Triple "C". The Court holds that Triple "C" is entitled to recover towage fees from Southern and that Caribbean Towing may recover towage fees from Triple "C" and Southern in solido.

The Court has jurisdiction of these actions and venue is properly laid in the Eastern District of Louisiana. Both jurisdiction and venue are conceded by all parties.

At midnight on January 20, 1963 the Caribbean left Morgan City, Louisiana for Beaumont to pick up the Cullen. The

[1] "3. If after the commencement of the voyage the tow is lost OWNERS shall pay TOWERS at the rate of $750.00 per day (hereinafter called the Tug's daily rate of hire) for all the time consumed by the tug from the hour of the day she leaves Beaumont, Texas, until the hour of the day she returns to her station at Morgan City, Louisiana, after being discharged from the towage service. If the tug does not return directly to her station the time of the return voyage shall be computed on the basis of the tug's normal running time to her station by the customary route from the point where the towage service ceased."

Caribbean arrived at Beaumont at 11:00 P.M. on January 20, 1963. Before the tow departed Beaumont, Caribbean and its tow were inspected by Mr. H. J. McNeely, a marine surveyor, appointed by Southern, and he certified that the tug and tow were seaworthy and capable of making the tow to New Orleans.

At approximately 12:30 P.M., on the same day, Caribbean took the Cullen under tow by use of a new eight (8″) inch nylon hawser and departed Beaumont for New Orleans. At that time, all available weather information in the area indicated that the weather conditions were fair and there was no reason for the master or crew of the Caribbean to anticipate any foul weather during the trip.

The Caribbean's tow was uneventful until January 23, 1963 when weather conditions became extremely foul and inclement with Northerly winds up to 50 m. p. h. with waves of fifteen (15′) feet. At approximately 1:30 P.M. on January 23, 1963 the towing line parted as a result of the high winds and seas and the Cullen was lost from the tow.

Due to the high winds and lightness of the ship, the Cullen was soon lost from sight. The Caribbean, together with the United States Coast Guard (Coast Guard) and another tug provided by Triple "C", the Edna S., began to search for the Cullen. In the evening of January 24, 1963, the Cullen was sighted by a Coast Guard airplane and the Edna S. went to the area where she had been sighted and ultimately located the Cullen. Despite heavy seas and extensive damage suffered by the Edna S., it managed to secure a new eight (8″) inch, twelve hundred foot nylon hawser to the Cullen, and towed her to a meeting area with the Caribbean. At approximately 7:00 P.M. on January 25, 1963 the Caribbean took the tow line from the Edna S. The Edna S. then took the remainder of the original tow line from the Caribbean and

secured it to the stern bitt of the Edna S. in order to assist in towing the Cullen to calm waters. The Caribbean and the Edna S. continued to tow the Cullen but were required to tow at a slow speed due to extensive fog in the area. On January 26, 1963, at approximately 3:30 P.M., the fog cleared but the winds again became so strong that the Cullen was pulling both tugs astern despite the fact that all engines on both tugs were running all ahead full.

On the morning of January 27, Northerly winds of 50 to 60 m. p. h. again struck the Gulf. Despite reasonable efforts of the tugs to prevent it, the main tow line parted and the Cullen again floated free and was lost from sight. The Caribbean and the Edna S. searched for the Cullen despite the heavy seas and high winds, but were unable to find her.

Shortly thereafter, a heavy fog descended and the Edna S. and Caribbean headed for Morgan City where the Edna S. abandoned the search. After refueling and obtaining a fresh crew, the Caribbean intended to resume the search.

In the meantime Charles Cloutier, President of Triple "C", notified Southern on January 28, that the Cullen was lost. Southern, by telegram,[2] ordered Triple "C" to locate and stand by the Cullen to prevent her from becoming "abandoned" or a "menace to navigation." Triple "C", in turn, ordered Caribbean Towing to seek out and find the Cullen and to stand by her and pervent her from being considered "abandoned" and "subject to salvage" or becoming a "menace to navigation."

On January 30, the Caribbean resumed its search for the Cullen. It searched the Gulf through use of radar and Coast Guard radio advisories, going out as far as 200 miles offshore. On February 3, the Coast Guard notified the Caribbean that the Cullen was on strand 15 miles Southwest of Galveston, Texas.

2. "Reference SS JOHN W. CULLEN underwriters representatives advise imperative your tug stand by all times order vessel shall not become menace navigation or be considered abandoned and have suggested we advise you they will hold Triple "C" responsible for all claims arising this matter."

The Caribbean proceeded to the site but was prevented from getting near the ship until the following day due to low tides and 75 m. p. h. Northerly winds.

The following day, the Caribbean's crew was prevented from putting a line on the Cullen by an armed prize party, which had boarded her and was claiming her for salvage. After several attempts, the master of the Caribbean and Mr. Cloutier, President of Triple "C", managed to get aboard the Cullen and, disregarding their personal safety, disarmed the prize party and put them off the ship. The Caribbean then made a line fast to the Cullen and stood by so that she could not be claimed as salvage by other parties.

Representatives of Southern and its underwriters, acting in behalf of Southern, ordered the Caribbean to attempt to pull the Cullen off the sand bar on a high tide. To assist in this project, Southern and its underwriters furnished at their expense, the services of the tugs, Marlin and Grampus. These two additional tugs were unsuccessful in their efforts, but were paid by Southern and discharged. The Caribbean remained at the site as previously ordered so the Cullen would not be considered abandoned and continued to pull on the Cullen with the knowledge and approval of Southern.

At this time, Carol Boyne of Caribbean, asked Triple "C" through its President, Mr. Cloutier, to release the Caribbean from this project. Cloutier stated that both Triple "C" and Caribbean Towing had been ordered by Southern to have the Caribbean stand by the Cullen for the purposes previously stated and that Caribbean Towing was to be paid Forty and No/100 ($40.00) Dollars per hour for its services until relieved. Consequently, the Caribbean continued to stand by the Cullen and continued her efforts to free the Cullen, all with the full knowledge and approval of Southern.

On February 16, Triple "C" Offshore, Inc., a totally separate corporation and not a party to this lawsuit, made a bid to salvage and refloat the Cullen on a "no cure-no-pay basis for Twelve Thousand and No/100 ($12,000.00) Dollars to be completed within ten (10) days. This bid was negotiated for Southern by J. R. Bencal, underwriter's representative. At the expiration of its bid, and with the Cullen still stranded, Triple "C" Offshore, Inc., was notified to remove its salvage equipment. On February 28, 1963, a "no cure-no-pay" contract to salvage and tow the Cullen to New Orleans was let to Bludworth Construction Company, Inc., for Eighteen Thousand Five Hundred and No/100 ($18,500.00) Dollars. This company successfully floated the ship and moved her to New Orleans. Bludworth was paid for this service by the ship's underwriters. On March 1, 1963 Bludworth Construction Company, Inc., assumed the stand-by duties of the Caribbean which was relieved to return to her home port, Morgan City, Louisiana. The Caribbean put to sea on March 1, 1963 and arrived at Morgan City, Louisiana, on March 3, 1963 which is the normal running time for such a voyage.

During the period of the Triple "C" Offshore, Inc., salvage attempt, the Caribbean continued to pull on the Cullen, but primarily stood by. It also rendered incidental assistance in occasional movement of salvage equipment because of heavy seas and strong winds.

Caribbean Towing invoiced Triple "C" for twenty-six (26) days at Four Hundred Eighty and No/100 ($480.00) Dollars per day representing the period from January 20, through February 16, less one (1) day of "make ready" time and two (2) days for refueling, provisioning and engine repair and one (1) day to sit out a storm at Galveston, plus the three (3) days in March required to return to port. Caribbean Towing also invoiced Triple "C" for twelve (12) days at Three Hundred Fifty and No/100 ($350.00) Dollars per day representing the stand by from February 17, through February 28. The services of the tugs Mr. Chester and Louise Ellis were never contemplated in the contracts of any of the parties.

■ Triple "C" has admitted its agreement to hire the Caribbean to tow

the Cullen at an agreed daily rate, which hire persisted for the term invoiced. Caribbean Towing has admitted granting a reduction in this rate for the period specified in the invoice. The relationship of lease was created between these parties. Shear v. Karno, La.App. (4 Cir. 1963), cert. denied 1963, 150 So.2d 916.

Southern admitted the execution of its contract with Triple "C" for the use of the Caribbean, and as we have already pointed out, provided a stated consideration for the completed towage service, then alternatively provided for a per diem compensation in the event the tow was lost. The contract further guaranteed Southern against a claim for salvage.[3]

▮ The Court holds that the Cullen was "lost" on January 23, so as to invoke the per diem provision of Article 3 of the Triple "C"-Southern contract. The Cullen was recovered through the efforts of the Caribbean, assisted by the Edna S. on January 25, 1963. The Cullen was lost once more, and finally on January 27, 1963. The term "lost" is defined in Black's Law Dictionary at page 1133 as follows:

"As applied to ships and vessels, the term means 'lost at sea,' and a vessel lost is one that has totally gone from the owners against their will, so that they know nothing of it, whether it still exists, or one which they know is no longer within their use and control, either in consequence of capture by enemies or pirates, or an unknown foundering, or sinking by a known storm, or collision or destruction by shipwreck. Bennett v. Garlock, 10 Hun (N.Y.) [328] 338; Collard v. Eddy, 17 Mo. [354] 355; [Delaware Mutual] Insurance Co. v. Gossler, 7 Fed.Cas. [404] 408."

The Cullen was gone against the will of Southern, Triple "C" and Caribbean Towing and none of them had any knowledge

of its whereabouts or condition until it was found stranded on the beach at Galveston.

Southern was obligated to dismiss the Caribbean from service when the tow became lost and per diem continued from such dismissal for a length of time normally necessary for the tug to return to its home port, except that Caribbean was obligated to stand by and exert *reasonable* effort in saving the tow from salvage. Mr. Diefenthal, President of Southern, in his memorandum in the record, admits to this obligation and to the fact that Southern gave no such notice of dismissal. The record is replete with testimony as to notice of loss of vessel given to Southern by Cloutier of Triple "C". Southern demanded that the Caribbean remain with the Cullen to prevent her from being considered derelict or a prize. Southern is liable to Triple "C" for the rental of the Caribbean at the agreed per diem rate for the entire period of service of the Caribbean. The obligation of Southern to Triple "C" under the per diem provisions of the contract commenced on January 23, 1963, when the Cullen was lost. For the time prior thereto, Southern is not obligated to Triple "C" since it did not complete the towage project. Triple "C", however, is liable to Caribbean Towing at the rate of hire agreed between them for the services of the Caribbean from January 20, 1963, until the loss of the tow since the provisions of the contract between Triple "C" and Southern did not bind Caribbean Towing. La.-Tex Equipment Rental Company v. Thomas W. Hooley & Sons, Inc., La.App. (4 Cir. 1961), 127 So.2d 766.

While Article 7 of the Triple "C"-Southern contract requires tower to stand by and precludes the tower from making any claim for salvage, it does not deny to the tower the contractual per diem fee to be paid in the event the tow is lost. It only requires the tug to exert a rea-

3. "7. * * * In the event of the TOW breaking away from the tug during the course of this towing service, the tug shall exert reasonable effort to stand by and render service in saving the TOW without making any claim for salvage."

sonable effort to prevent salvage. It would not require that Triple "C" stand by without pay in perilous weather conditions, to make repeated attempts to retrieve the vessel in dangerous seas, to retake the vessel from armed boarders intent on making her a prize, and to stand beside the stranded ship for approximately a month in order that the ship not become abandoned or a derelict or a menace to navigation. The services performed and the risks incurred by the Caribbean were far beyond the scope of the towage contract. Caribbean Towing and Triple "C" would probably have been entitled to salvage after they had exerted a *reasonable* effort to stand by and save the tow.

■ The evidence reflects no negligence on the part of Triple "C" or Caribbean Towing in preparing for the voyage, selecting the crew, rigging for the tow, determining the condition of the weather, and conducting the towage operation. Southern was required to establish by a preponderance of the evidence the negligence of the Caribbean or its crew. The Fifth Circuit Court of Appeals said in Stall & McDermott v. The Southern Cross, 196 F.2d 309 (1952):

> "The law regarding towage is well settled. The mere fact that a tow receives injury does not render the tug liable. Negligence must be affirmatively shown and the burden of proving negligence rests upon those seeking to establish liability therefor. The tug is not liable as an insurer or as a common carrier, but owes to the tow the duty to exercise such reasonable care and maritime skill as prudent navigators employ in the performance of similar services."

Southern also urges that the doctrine of res ipsa loquitur applies. While the Court doubts that it is applicable, it avails Southern little in this case. As Judge West said in Louisiana Materials Company, Inc. v. Royal Pellegrin, et al., 211 F.Supp. 4 (E.D.La.1962):

> "Even in the case where the doctrine of res ipsa loquitur applies, it is but an aid to the libellant in carrying his burden of proving a breach of duty of care on the part of the towing vessel and her crew, and it does not avoid the requirement that upon the whole case, the libellant must still prove his case by a preponderance of the evidence."

Judge West went on to find that as a matter of law the doctrine of res ipsa loquitur did not apply because there were other hypotheses upon which the cause of the damage could rest aside from any alleged negligence on the part of the towing vessel. This is equally true in the instant case. The evidence clearly demonstrated that the damage complained of could have occurred without any negligence on the part of the Caribbean or its crew. Since this was true, res ipsa loquitur does not apply.

I find then that as a matter of law Southern failed to show that the damage complained of could not have occurred in the absence of negligence on the part of the Caribbean. There is substantial evidence that the unexpected and severe weather conditions which prevailed at the time of the loss of the tow caused the hawser to part resulting in the loss of the Cullen.

■ The Court further concludes that Southern was well aware of the efforts being made to save its tow by the Caribbean. When it specifically ordered Triple "C" by telegram on January 28, 1963 to have the Caribbean stand by the Cullen to see that it did not become a "menace to navigation" or be considered "abandoned", Southern reaffirmed the contractual relationship between Triple "C" and itself. This reaffirmation required Southern to pay a contractually agreed per diem of Seven Hundred Fifty and No/100 ($750.00) Dollars for the stand by services of the Caribbean. The telegram and the telephone calls from Southern and its underwriters to the masters of the Caribbean created a quasi-contractual obligation between Southern and Caribbean Towing justifying an award in favor of Caribbean Towing and against Southern for the reasonable value of the services of the Caribbean.

784

The reasonable value of these services was established by the contracts between the parties and was not questioned or contraverted. C. E. Evans Company, Inc. v. Chachere, La.App., 155 So.2d 430 (3 Cir. 1963). The record clearly reflects that the reasonable value of the services of the Caribbean to Southern would be not less than the amount invoiced to Triple "C", Sixteen Thousand, Six Hundred Eighty and No/100 ($16,680.00) Dollars.

The testimony of J. R. Bencal, offered as an expert witness on behalf of Southern, was objected to by Caribbean Towing and Triple "C" since the witness Bencal remained in the courtroom throughout the trial despite the fact that the Court had invoked the rule for exclusion of witnesses. This witness was not an officer or employee of Southern and therefore was subject to the rule. The Court has, in its discretion, decided to admit Mr. Bencal's testimony and to give it such weight as the Court thinks it deserves. The Court has considered the opinion of Mr. Bencal, and has decided that the reasons given in support of his opinion are unsound and his testimony will therefore be given little weight. On the other hand, the opinions of Cloutier, McNeely, and the masters of the Caribbean appeared to be well reasoned and logical. Their testimony concerning the seaworthiness of the Carribbean and its tow was convincing.

The Court finds no merit in the contention of Southern that the efforts of Bludworth Construction Company, Inc., were necessitated as a result of the negligence of Triple "C" and denies the cross-claim of Southern against Triple "C" and the consequent claim for indemnification of Triple "C" against Caribbean Towing.

Triple "C" is entitled to recover from Southern Twenty-Six Thousand, Two Hundred Fifty and No/100 ($26,250.00) Dollars with interest and costs. Caribbean Towing is entitled to recover from Triple "C" and from Southern, jointly, severally and in solido, the sum of Sixteen Thousand, Six Hundred Eighty and No/100 ($16,680.00) Dollars with interest and costs. The recovery from Southern by Triple "C" and Caribbean Towing, jointly, severally and in solido, will not exceed the sum of Twenty-Six Thousand, Two Hundred Fifty and No/100 ($26,250.00) Dollars, and the payment by Southern of that sum together with interest and costs of Triple "C" and Caribbean Towing, will exonerate it from liability hereunder.

Let a judgment be entered accordingly.