## THE NEGUS.

### MOWINCKEL et al. v. NEW YORK & BERMUDEZ CO.

(District Court, S. D. New York. May 2, 1923.)

1. **Shipping ⬤⟳40—Owner held not entitled to withdraw vessel chartered for "about" five years for classification survey, where overlap shorter than underlap.**

Under charter of vessel for "about" five years, terminating "about" February 23d, where cargo was discharged January 19th, and evidence showed that necessary repairs would not have delayed sailing beyond February 1st, and that another voyage could have been completed by March 11th to 15th, overlap being shorter than underlap, owner was not entitled to withdraw vessel for Lloyds' classification survey, which would prevent another voyage within term.

2. **Shipping ⬤⟳42—Lloyds' classification does not make vessel seaworthy, nor does absence thereof make it unseaworthy.**

Lloyds' classification does not make vessel seaworthy, nor does absence thereof make her unseaworthy, though failure to submit to classification survey would result in vessel's classification being expunged, which could be restored by subsequent satisfactory survey.

In Admiralty. Libel by the New York & Bermudez Company against the steamship Negus, with cross-libel by John Ludvig Mowinckel and another, owners, against the libelant. Decree for libelant on its libel, and for cross-libelant on cross-libel. Decree affirmed in 298 Fed. 752.

Burlingham, Veeder, Masten & Fearey, and Roscoe H. Hupper, all of New York City, for New York & Bermudez Co.

Haight, Smith, Griffin & Deming and Herbert K. Stockton, all of New York City, for Orvig Dampskibsselskab and others.

WARD, Circuit Judge. February 23, 1915, the libelant chartered the Norwegian steamer Negus for the term of "about" five years, and she was engaged in carrying asphalt from Guanoco, Venezuela, to Maurer, N. J., for the last year of the charter, which would expire "about" February 23, 1920. The material provisions of the charter party are:

"This charter party, made and concluded upon in the city of New York, the 8th day of October, 1913 [for a steamer] provided with proper certificate for hull and machinery, and classed 100 A. 1. at British Lloyds' or its equivalent * * * for a period of about five years. * * *

"1. That the owners shall provide and pay for all provisions, wages and consular shipping and discharging fees of the captain, officers, engineers, firemen and crew, shall pay for the insurance of the vessel, also for all the cabin, deck, engine room, and other necessary stores, and maintain her in a thoroughly efficient state, in hull and machinery, for and during the service."

"(3) That the charterers shall accept and pay at once on delivery of steamer for all coal in the steamer's bunkers on delivery and the owners shall, on expiration of this charter party, pay for all coal left in the bunkers, each at the current market prices at the respective ports where she is delivered to them."

"4. That the charterers shall pay, for the use and hire of said vessel, four shillings (4/-) British sterling per ton deadweight on steamer's total summer deadweight capacity per calendar month, commencing on and from the day of her delivery, as aforesaid, and at and after the same rate for any

⬤⟳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

part of a month; hire to continue until her delivery, with clean holds to the owners [unless lost] at a United States Atlantic port north of Cape Hatteras, port at charterers' option."

"5. That should the steamer be on her voyage towards port of return delivery at the time a payment of hire becomes due, said payment shall be made for such length of time as the owners, or their agents and charterers, or their agents, may agree upon as the estimated time necessary to complete the voyage, and when the steamer is delivered to owners' agents any difference shall be refunded by steamer or paid by charterers, as the case may require."

"6. Payment of the said hire to be made in cash monthly in advance in New York. * * * "

"15. That in the event of the loss of time from deficiency of men or stores, breakdown of machinery, stranding, fire or damage preventing the working of the vessel for more than 24 running hours, the payment of the hire shall cease until she be again in an efficient state to resume her service; but should she in consequence put in to any port, other than that to which she is bound, the port charges and pilotages at such port shall be borne by the steamer's owners, but should the vessel be driven into port, or to anchorage by stress of weather, or from any accident to the cargo, such detention or loss of time shall be at the charterer's risk and expense."

"21. That as the steamer may be from time to time employed in tropical waters during the term of this charter, steamer is to be docked, bottom cleaned and painted whenever charterers and master think necessary, but at least once in every six months, and payment of the hire to be suspended until she is again in proper state for service."

The steamer was due in February, 1918, for her third special classification survey, which was a very important one; but the owner, at the request of the charterer, obtained an extension of the survey to September, 1919, upon a "general examination," and another to December 27, 1919, on the same terms. December 19, 1919, the owner notified the charterer that the steamer would undergo the third special classification survey upon her return to the United States, and must then be redelivered with clean holds, because there would not be enough time left for another voyage.

[1] January 10, 1920, the steamer arrived at Maurer, discharged her cargo January 19, and was engaged in cleaning the bilges and making other necessary repairs until January 20 at 11 p. m. when the owner withdrew her against the charterer's protest. Thereupon the charterer filed this libel against the steamer to recover the value of coal aboard, $243; overpaid hire to January 23, $414.70; and damages in the amount of $37,500 for increased expense of securing another steamer to carry a cargo of asphalt from Guanoco to Maurer. The owner filed a cross-libel to recover the sum of $5,776, the expense incurred in removing the asphalt fittings.

If the steamer could have sailed from Maurer even as late as February 1, 1920, she should have made another voyage in from 38 to 42 days; that is, by March 11th to 15th. This would have involved a shorter overlap than there would have been an underlap—a very reasonable voyage, in my opinion, within the language "about" five years, The Rygja, 161 Fed. 106, 88 C. C. A. 270; Trechmann v. Munson, 203 Fed. 692, 121 C. C. A. 650; Prebensens v. Munson, 258 Fed. 227, 169 C. C. A. 295.

There were, however, irrespective of classification, certain repairs needed to make the vessel seaworthy, and the owner, which was bound

to maintain her in a seaworthy condition by express covenant in the charter party, had the right and the duty to make these repairs before she should proceed to sea again. The evidence shows that they could have been made while the steamer was discharging at Maurer and would not have delayed the sailing beyond February 1.

[2] Lloyds' Register of Shipping could not enforce the third special classification survey; failure to submit to it would result in the vessel's classification being expunged, not for unseaworthiness, but for noncompliance with Lloyds' Rules in respect to the third survey, and the classification could be restored upon a subsequent satisfactory survey. Classification does not make a vessel seaworthy, nor the absence of it make her unseaworthy. Some forms of charter parties, as, for instance, the tank steamer time charter of the Standard Oil Company of New Jersey, require the owner to maintain the classification, and so does the Texas Company's voyage charter. But in the charter under consideration the classification is merely a matter of description, which, if true at the beginning of the adventure, satisfies the owner's obligation in this respect. Scrutton on Charter Parties (10th Ed.) p. 84.

To maintain a vessel's classification is certainly very useful to the owner, because it preserves the good repute of his vessel, makes it certain that he can obtain insurance, and insurance upon lower premiums than if she were unclassified, and is an inducement to shippers or charterers to employ the vessel. So it enables shippers or charterers to get reasonable rates of insurance upon shipments. In the case of this cheap, viscous, and unperishable cargo insurance was of no consequence whatever to the charterer. In shipping asphalt, the cargo battens are taken out of the vessel, and she is fitted up with heavy fore and aft and cross bulkheads; the skin being ceiled. If any water comes aboard, it cannot injure the cargo, nor get into the bilges or holds. All that it will be necessary to do will be to pump it out from the surface of the asphalt.

I am quite satisfied that Lloyds' Register would have permitted the steamer to make another voyage if the owner had requested it, but the owner notified the charterer December 19, 1919, before having any negotiation with Lloyds' Register on the subject, that she would be withdrawn at the end of the pending voyage. The letters of the secretary of Lloyds' Register, dated December 29, 1919, and January 15, 1920, indicated that the owner itself asked that the third special survey be had. Foley, a clerk of the charterer's agents, says that on January 12, 1920, he saw Mr. French, chief surveyor of Lloyds' Register of Shipping, who said that the steamer might go to Venezuela for another cargo of asphalt, if that were to be her last trip, and, though Mr. French did not recollect this conversation, he also said that no definite application had been made by the owners to let the vessel go. The letter of Lloyds' secretary dated January 15, 1920, only stipulated for a "general examination" as a condition of permitting another extension. Notwithstanding the letter of the Lloyds' committee, dated December 29, 1919, to its surveyors, rescinding the permission to allow extensions to owners which had prevailed during the war, it re-

mained, according to Mr. French, optional with them to report whether vessels were entitled to their classification, and it was only the "general examination" that the secretary asked for in this case.

The real contest is whether the owner had the right to withdraw the steamer for her third special classification survey, which concededly would take and did take a time so long as to make another voyage unreasonable within the limitation of "about" 5 years. The charterer asked the owner to get extensions of the third special classification survey on two occasions in 1919, which were granted by Lloyds' Register after a "general examination." It also appears that the steamer J. Ludvig Mowinckel under a similar charter party had been withdrawn, off hire, for her third special classification survey.

The owner contends that this is proof of conduct showing an understanding that it had a right to withdraw her. I do not agree to this. Nothing whatever is said in the charter party, which was the owner's form, about a withdrawal for this purpose, although articles 15 and 16 expressly provide for time lost for other causes. I cannot read such an important provision into it. Such a question is only likely to arise in case of time charters, or charters for a succession of voyages. But there is no evidence of any custom or universal practice with reference to such a withdrawal; it being evidently a matter of arrangement between the parties in each case.

As the charterer will get full compensation for the owner's breach of the charter party, I see no reason why it should not reimburse the owner for the reasonable expense it incurred in removing the asphalt fittings, which it was the charterer's duty to do under the charter party.

A single interlocutory decree may be entered for the claim of the New York & Bermudez Company, with costs, less the reasonable expense incurred by Orvig Dampskibsselskab in removing the asphalt fittings.