## THE MARINER.
### No. 811.

District Court, D. Massachusetts.

Nov. 29, 1940.

Bingham, Dana & Gould, of Boston, Mass., for libellant.

Thomas H. Walsh, of Boston, Mass., for respondent.

FORD, District Judge.

This is a libel brought by Frederick Starr Contracting Company, a New York corporation, against the oil screw tug "Mariner" and her master, Loren A. Jacobs, as a result of the sinking of the Scow 28, which was owned by the libellant and in tow of the "Mariner" near the southern end of Plum Island, Ipswich Bay, on October 20, 1937.

### Findings of Fact.

The "Mariner" left Lanesville at or about 7 A. M., on October 20, 1937, with a loaded scow, Lighter 22, bound for Newburyport. She arrived at Newburyport Harbor between 11:15 and 11:30 A. M., turned the loaded scow over to the tug "Beetle", made fast to Scow 28, which was light at the time and drawing about three feet, and then proceeded out of Newburyport Harbor bound for Lanesville. The Scow 28 sank at 6:30 P. M.

The "Mariner" was a tug of 36 gross and 24 net tons, 56.4 feet in length, 15.3 in breadth, and 7.2 in depth. She was thirty years old and had been fitted with a Diesel engine of 160 horsepower about six months prior to October 20, 1937. She carried a crew of three men,—master, mate, and engineer.

The Scow 28 was a flat-deck scow 115 feet in length, 34 in width, with 10-foot sides. Normally, when light, she had a freeboard of seven feet. The sides and ends were of six-inch planking and the top

and bottom had four-inch planking. She was built in her entirety of long leaf yellow pine. The entire vessel was caulked and pitched, and had been overhauled and repaired in the summer of 1936. She had a one-cylinder gasoline pump on the open deck on the aft starboard side about three feet from the rail. The pump was exposed to the weather with no covering sufficient to protect it from spray and rain. The pump had a three-inch line.

On the trip with which we are concerned here, the scow was in charge of Scowman Marluzzi, who testified that it was his wont to pump the scow three times a day from ten to twenty minutes as she lay at her wharf at Newburyport, in order to keep the scow dry. Each time he pumped her, there was accumulated about seven, eight, or nine inches of water. He, also, stated that she made more water in rough than in calm weather; that she was loose and would take water through the seams. Captain Nickerson, an expert called by the libellant, stated, also that Scow 28 was not in good condition.

The respondent Jacobs had been engaged in tow boat work for 25 years and held a state pilot's license from Portsmouth to Lynn and a federal license for waters in the vicinity of Salem, Gloucester, Marblehead, and up to Newburyport. The evidence showed that he had towed this scow a great many times between Lanesville and Newburyport, knew her condition generally, and regarded her as being in fair condition.

Jacobs testified that on the evening of October 19, he had seen weather forecasts for the day of the accident in the "Gloucester Daily Times" and in the "Boston Traveler". Fresh to strong south and southwest breeze, veering to westerly late Wednesday (October 20, 1937), was predicted in the Gloucester papers, and increasing south winds, shifting to southwest and becoming strong Tuesday night with rain predicted for Wednesday, was the "Boston Traveler" weather forecast. When the "Mariner" left Newburyport about 11:30 A. M., on the day of the accident, headed for Annisquam, which is in a general south by east direction, the master considered the wind and sea conditions perfectly safe to begin the tow. Lanesville is about 9½ miles away. He further testified that when he left Newburyport the sky was overcast, the wind was blowing fresh, it increased to strong during the afternoon, and the sea was choppy. An increase in wind came about 2 P. M., and at that time waves were breaking on the crest. It was admitted by Jacobs that the condition of the sea had increased in roughness somewhat between the time the "Mariner" left Newburyport and the time the tug sank.

According to the log of the Coast Guard Cutter "Harriet Lane", the wind at 12 M. was south with a force of 6, or 22–27 sea miles per hour on the Beaufort scale. According to the same log, the wind at 4 P. M. had attained a force of 7, or 28–33 sea miles per hour on the Beaufort scale. The force of the wind increased at 7 P. M. to 8, or 34–40 sea miles per hour on the Beaufort scale. It, also, appeared from this log that the barometer at 12 M. was 29.46 and at 6 P. M. 29.39. The surf was described by the records of the Merrimack River and Plum Island Coast Guard Stations as rough at noon and 4 P. M. The wind at Plum Island, several miles from Newburyport, at noon, had a force of 6, or 22–27 sea miles per hour on the Beaufort scale. The "Harriet Lane" made her noon observation as to wind at Gloucester, about twelve miles from Newburyport. The records of the Merrimack River Station, at the entrance to Newburyport Harbor, from which the "Mariner" left, reveal that the wind at noon had a force of 5, or 17–21 sea miles per hour according to the Beaufort scale. There was no evidence that any storm warning signals were flying when the "Mariner" left Newburyport Harbor.

Between 1 and 1:30 P. M., when the "Mariner" had gone 1½ miles beyond the buoy at the entrance to Newburyport Harbor, fire broke out in her smokestack, due, according to the respondent Jacobs, to an accumulation of carbon caused by the use of oil employed in lubricating the new Diesel engine. The "Mariner's" engine at this time was slowed down and she was holding her own against the wind. After about twenty minutes to a half hour, the tug proceeded on her voyage. Another fire broke out in the stack about half an hour after the first fire had burned itself out, and the tug was again slowed down for about fifteen minutes to allow this fire to burn out. This fire burned out at 2:10 P. M. and the tug proceeded on her way.

The respondent testified, and I find it to be a fact, that it would not, at this time,

be reasonably safe to return to New-buryport because the condition of the tide made it impossible to get across the bar at the entrance to the harbor.

Marluzzi, the scowman, stated at the trial, that at about 3:30 P. M., the water became rough with waves coming over the side. At this time, the freeboard of the scow was six or seven feet, which was usual and normal as the tow was light. He testified he tried to signal the tug, but was unable to attract any attention. The wind at this time was practically south and blowing directly against him. Marluzzi further testified that he returned aft to his living quarters and remained there until about 5:30 P. M. As a matter of fact it was nearer 6:30 P. M. At that time, he climbed on top of the deckhouse and signalled the tug with a lantern. He stated that at that moment the scow went down all at once as if something gave way. The scow became awash. Marluzzi, also, testified he attempted to use the pump on the scow at about 1:30 P. M., but was unable to make it work because the wires were wet as a result of spray breaking over the scow. At the time the scow sank the waves were four to five feet high.

When Scow 28 sank, the "Harriet Lane" was standing by the "Mariner" and her tow as the result of a request Jacobs had made because of the fires in the stack earlier in the day. The cutter reached the "Mariner" about 5 P. M., and those on board noticed the scow was sinking at 6:30 P. M. The cutter lowered a surfboat and took aboard Mr. and Mrs. Marluzzi. At that time, according to the log of the cutter, there was a heavy sea and poor visibility.

An expert called by the libellant stated that scows of the type of Scow 28 tow fairly good when they are light, but handle hard when loaded. When light, not a great deal of water goes over them. He further stated that if the scow were sound and light, spanking and pounding of a four or five-foot chop would do no damage. He further stated, as an expert, that if the wind were blowing twenty miles per hour (it was blowing 17–21 miles per hour) when the "Mariner" left Newburyport for Lanesville, it would not be unsafe for the "Mariner" to have started her voyage, even if the scow was in the poor condition he said she was. And he further testified it would be unsafe to take out this scow in the condition she

was in if the wind were blowing 25 miles per hour, because of the fact that the tug was too small.

The evidence showed that after the accident the scow lay awash in Gloucester Harbor in the control of the libellant. The latter introduced no evidence as to her condition after the disaster.

### Conclusions

I cannot find, from the facts found, that the libellant has proved by a fair preponderance of the evidence that the tug and the respondent Jacobs were at fault for the accident to Scow 28. I noted at the time of trial, and it impresses me more as I give it consideration, that the libellant has not been so helpful as it might in aiding the court to determine the reason why the scow sank. The libellant argues she sank because she was subjected to a pounding by the wind and sea. But this was only part of the story. What is not shown here—and it was within the grasp of the libellant to show it—is the condition of the scow after the sinking. Evidence of her condition would have aided in determining exactly the cause of the sinking. One of the expert mariners for the libellant said she would not sink if she were sound—that she could stand the pounding of the sea.

It was the opinion of this same expert for the libellant—Nickerson—that it would have been safe to take this scow out, which he said was in poor condition, if the wind were blowing twenty miles an hour. The captain of the "Mariner", who was an experienced man, concluded that it was safe to take the scow out under the conditions. The records of the Merrimack River Station, the nearest to Newburyport Harbor, reveal that the wind had a force of 5, at 12 M., or 17 to 21 sea miles per hour on the Beaufort scale. The respondent Jacobs stated in his testimony that when he started, he estimated the wind as "fresh", which is 17 to 21 sea miles an hour on the scale referred to.

Thus, on the testimony of its own expert, Nickerson, the libellant cannot ask this court to find there was negligence on the part of Jacobs, the master of the "Mariner", in starting on the trip from Newburyport to Lanesville. The weather forecast of increasing winds and the slightly falling barometer are not at all conclusive that the master of the tug was negligent, especially in view of the fact the scow was light,

had a freeboard of six or seven feet, and in view of the testimony of the libellant's expert that the tug would have made it if the scow were sound.

■ I find the scow would have made the trip successfully if she were in seaworthy condition. I find the real reason Scow 28 sank was because she was in an unseaworthy condition, concerning which fact, the respondent had no knowledge. When you consider that this scow was light and had a freeboard of six or seven feet up to the time she sank all at once, it leads to the determination that she was unseaworthy. The Radnor, D.C., 21 F.2d 982, 983; The Senator Rice, D.C., 15 F.2d 882, 883; and The Dutton No. 6, D.C., 9 F.Supp. 233, 236. The respondents here cannot be held liable if Scow 28 was unseaworthy and it was because of this condition that the disaster occurred. They were not insurers. The Dorothy R. McCollum, D.C., 3 F.Supp. 894. In addition, the pump on Scow 28 was out of order. Her whole condition showed her to be in a state of neglect. The owner of the tow is responsible for her seaworthiness and the owner of the tug for her safe navigation. The Radnor, supra. What the tug "Mariner" undertook was only to exercise that degree of skill, care, and prudence that was necessary for the management of a seaworthy boat. The Margaret, 94 U.S. 494, 24 L.Ed. 146. This I find she did.

There is no merit in the libellant's contention that the respondent Jacobs was negligent in not seeking shelter. The evidence showed that the scow had her customary freeboard of six or seven feet right up to the time she suddenly went down. If she had not suddenly gone down, the scow would have gotten through, as the evidence shows. This happening was so sudden there was little the master of the tug could do except cut her adrift. It was too late to tow her to safety even if he turned and ran before the wind. The evidence shows that he could not get over the bar at Newburyport if he turned around and it would be unreasonable, as the libellant contended, in view of the condition of the scow after the sinking, due solely to her own unseaworthiness, to expect the "Mariner" to tow her to Portsmouth, New Hampshire, many miles north of Newburyport. Again, the pump on the scow might have helped some, if it were in condition to work, but that was gone, as was the unseaworthy scow.

■ I cannot find that the fires in the stack of the "Mariner" had anything to do with the sinking of Scow 28, in view of the finding that the scow would have made it if she were seaworthy. The evidence did not in any way compel a conclusion that the tug was not of sufficient power to undertake this voyage. The evidence showed that the "Mariner" many times had towed scows of the type of Scow 28, loaded and unloaded, across these waters from Newburyport to Lanesville. Captain Nickerson, the libellant's expert, did finally testify he thought the "Mariner" had insufficient power to take the scow across under the conditions, but he did not convince me that that was the fact, especially in view of his previous testimony that it was safe for the "Mariner" to take her across if she were sound. I cannot find the tug had insufficient power to take this scow across from Newburyport to Lanesville. She had taken her across many times before, though there was no evidence as to the conditions that prevailed. I find she had ample power to take her across to Lanesville under the conditions that prevailed if the scow was not unseaworthy.

■ The point raised by the libellant that the respondent Jacobs did not show proper regard toward the tow and this had some bearing on the question of negligence, is without substance. The tug kept a reasonable watch on the scow. The fact that they did not see the scowman at the exact moment he says he hollered and whistled to attract attention—3:30 o'clock in the afternoon—does not indicate any neglect on the tug's part in this direction. The wind blowing against the tow could have been responsible for this. The evidence shows that the captain and mate of the "Mariner" were keeping a watch and the fact of the matter is they did see the lantern signal. Up to the time the scow sank she had a freeboard of six or seven feet and there was nothing dangerous to observe about her condition, until she suddenly sank without notice to anyone. I find that the observations made by the captain and mate of the tug at short intervals were all that could be reasonably expected of the tug in fulfilling her duty to keep a reasonably close observation of her tow.

Finally, there was nothing in the testimony of the libellant's expert Mason that convinced me I should reach a conclusion contrary to the one reached here.

In view of the above findings and conclusions, judgment may be entered for the respondents, with costs.