## THE RONDOUT.

## THE BERN.

## McLAIN LINE, Inc., v. READING CO.

### No. 16874.

District Court, E. D. New York.

Jan. 19, 1944.

Alexander & Ash, of New York City (Joseph M. Meehan, of New York City, of counsel), for libellant.

Macklin, Brown, Lenahan & Speer, of New York City (Paul Speer, of New York City, of counsel), for respondent.

GALSTON, District Judge.

The libel alleges that on April 1, 1943 the Rondout was light and properly moored to the rack at 96th Street, East River, New York City; that while she was made fast, at about 9 p. m., the tug Bern arrived, pursuant to contract, to make up a tow of light vessels among which was the barge Rondout.

The Rondout was placed alongside of the Armstrong, making the Armstrong and the Rondout the two head boats, and the Mulqueen and the McLain the two stern boats. Forsythe, the master of the Bern, directed his deckhand in putting out hawsers to the head boats. First the port cable was put out to the inside boat, the Armstrong.

At this point the two versions differ. The Rondout captain, Mackey, testified that the towing hawser from the tug was handed over to him; that he attempted to put it on the starboard cleat of the Rondout and that while he was doing so the tug captain told him not to put it there but to put it on the middle bitt, which he did without objection. Forsythe, the Bern captain, on the other hand, and his deckhand, testified to quite a different story. They say that during the making up of the tow, as the starboard hawser was passed to the captain of the Rondout he started to place it on the starboard cleat, but Forsythe observed that there was a board fastened over the chock and asked what was the matter with the chock. Mackey,

without giving an answer, placed the hawser on the middle bitt of the Rondout.

While this was going on the stern of the tug Bern was put against the bow of the Rondout and Forsythe was standing on the stern of the tug so that he was in good position to see what he described. He noticed that the middle bitt was inclined at a forward angle.

The tide being ebb, the tow was drifting back, and though Forsythe knew that it was better to tow from the corners instead of from the middle bitt because of the drifting of the tow, it was a question of his getting ahead to prevent the tow from dropping back to the mainland. At any rate the Bern rounded to and went ahead on a slow bell, taking up the slack of the hawser, until the tow was straightened up, and then proceeded down the river. In rounding to the strain was on the port hawser as the tow turned to starboard. The tow then proceeded down the river about three miles, until it joined with the Tice tow in the middle of the river. Forsythe hauled his four boats to the stern of his tow and dropped back alongside the barge Rondout to make sure that his four boats were secured to the tow. At that time he noticed that the main bitts on the barge Rondout were at the same angle as when the line was placed over the center bitt. The captain of the Rondout made no complaint of any damage to his boat and the tow had encountered no trouble in coming down the river. Nor during the trip to Port Reading was there complaint made by the captain of the Rondout of any damage.

On April 2, 1943 the Rondout was in another tow coming up from Port Reading to New York, but was not one of the hawser boats. On that voyage there was nothing said to the captain of the Patience, which had that tow in charge.

The libellant claims that improper navigation at 96th Street resulted in pulling the middle bitt from its fastenings, necessitating repairs to the second bumper log, the deck beam, four sole pieces and two upper sole pieces. On the other hand, the respondent points out that libellant's case depends wholly on the testimony of the barge captain to establish any supposed negligence at that or at any subsequent point on the voyage. It must be said that the bargeman's testimony was not too

credible. His story is that in making the turn to the right, the tug was going hooked up, and that during that maneuver the bitts were pulled out and broke the deck planks. Though this occurred at the outset of the voyage the tug was ahead of him and he made no effort to say anything to those on the tug. The survey shows no deck planks broken, though there is reference to a repair to be made to a deck beam. It seems unlikely that the tow could have proceeded from 96th Street to 30th Street with the middle bitt, on which the hawser was tied, pulled out and dropped beneath the deck and into the hold for that distance without causing others in the tow or on the tug to notice that something was wrong. Nor is the barge captain's story that the tug stayed in the middle of the river trying to get the hawser out of the Rondout confirmed.

Importance must be given to the testimony of Lindquist, a marine inspector who represented the Reading Railroad in the survey held on the Rondout on April 9, 1943. He noticed that the timbers on the Rondout at the time of the survey were in poor condition and he observed that the fastenings of the bitt had pulled out from these underneath portions and that those portions were broken in the process.

On the whole, the testimony of the tug captain and his deckhand in respect to the presence of a board fastened across the starboard chock of the Rondout must be accepted.

The remaining question is whether it was negligent on the part of the tug captain to proceed with the hawser fixed on the middle bitt, having observed that the middle bitt angled forward. It is clear that he did not know of such conditions until the four boats were made up and were ready for the hawsers. In the circumstances, with the tide ebb, he had to make an election of proceeding as he did or running the risk of having the whole tow run adrift on the mainland. He had the right to assume that the master of a boat offering her for towage represents such boat as sufficiently staunch and strong to withstand the ordinary perils to be encountered on the voyage. "If she be unseaworthy by reason of weakness, decay or leaks and such defects are not obvious to the master of the tug he will be absolved from responsibility where such unsea-

worthiness causes the damage complained of. The tug undertakes only for that degree of skill, care and prudence necessary for the management of a seaworthy boat." The Edmund L. Levy, 2 Cir., 128 F. 683, at page 684. See, also, The Syracuse, D.C., 18 F. 828; and Southgate v. Eastern Transportation Company, 4 Cir., 21 F.2d 47. The fault, therefore, cannot be ascribed to any act of negligence on the part of the tug. The libel will be dismissed. Concurrently with this opinion appropriate findings of fact and conclusions of law will be filed.