FREDERICK SNARE CORPORATION,
as owner of THE Derrick Barge
F.S.C. NO. 110, Libelant,

v.

MORAN TOWING & TRANSPORTA-
TION CO., Inc., THE Tug JULIA C.
MORAN, her engines, etc., Tug Julia C.
Moran, Corp., Claimant-Respondents.

MORAN TOWING & TRANSPORTA-
TION CO., Inc., Libelant,

v.

FREDERICK SNARE CORPORATION,
Respondent.

United States District Court
S. D. New York.

June 23, 1961.

Foley & Martin, New York City (by
John Hanrahan, Jr., and Edward Ryan,
New York City), for libelant.

Burlingham, Hupper & Kennedy, New York City (by Robert Feltner and Eugene Underwood, New York City), for respondent.

EDELSTEIN, District Judge.

These cross suits, consolidated for trial, arose out of the sinking of the derrick barge F.S.C. No. 110, on September 8, 1956, while in tow of the Tug Julia C. Moran. Snare sues for loss of the barge and Moran cross-libels for the loss of the Julia's towing gear.[1] The facts describing the occurrence are not in dispute. The cause of the sinking, however, is the subject of vigorous disagreement.

Frederick Snare Corporation was and still is a corporation organized and existing under and by virtue of the laws of the State of New York and at the times referred to herein was the owner of the derrick barge F.S.C. No. 110. Moran Towing and Transportation Co., Inc., was and still is a corporation organized and exisitng under and by virtue of the laws of the State of New York, and at the times referred to herein was the operator of the Tug Julia C. Moran, and the owner of the hawsers, shackles and other towing gear and equipment of the Tug Julia C. Moran. Prior to September 4, 1956, Snare entered into an agreement with Moran under the terms of which Moran agreed to tow the 110 from Delaware City, Delaware, to New York City. Pursuant to its contract Moran supplied the Tug Julia C. Moran for the towage.

Derrick Barge F.S.C. No. 110 was originally a steel carfloat of riveted construction. In 1950 the carfloat was acquired by Snare, which removed the center section and mounted a revolving crane on the deck. As converted, the 110 was 84 ft. long, 38 ft. wide, and about 9½ ft. deep, and weighed a couple of hundred tons. She had four non-watertight transverse bulkheads and no longitudinal bulkheads. In October 1955 the 110 was taken to Delaware City where Snare was engaged in building three T-piers. While there the barge was aground for two days driving piles. Although Snare's construction superintendent was aware that the grounding had put an unusual strain on the hull only a visual inspection was made after the barge was refloated. No hydrostatic or hose test was made to determine whether or not the barge's watertightness above the waterline had been affected. Snare admitted that it did not drydock the 110 or do any repair or maintenance work on it prior to September 4, 1956, while the 110 was at Delaware City.

In September 1956 the job at Delaware City having been completed, Snare proposed to have the 110 towed to New York. Snare applied to the Philadelphia office of the United States Coast Guard for a Certificate of Inspection as a seagoing barge. Commander Madison, the Coast Guard Inspector, examined the barge on September 4, 1956, and found her quite a bit below the minimum standards for a seagoing barge. No Certificate of Inspection was issued to the 110. However, Commander Madison made certain recommendations for work to be done on the 110, which would allow him to issue a Permit to Proceed for Repairs from Delaware City to New York.

In the interval between Commander Madison's inspection of September 4th and his return on September 7th, Snare did the recommended work on the 110 and also prepared her for the tow. Various equipment was loaded on the deck of the 110, including a six ton boom, an 800 lb.

1. The issues to be resolved were stipulated by the parties and entered as a pre-trial order. In the claim by Snare against Moran for the sinking of the barge, the issues are:
 1. Was the loss of the barge caused by any negligence of Moran?
 2. Did any negligence of Snare or did Snare's failure to offer a seaworthy barge contribute to the loss?

 3. Damages, if any.
 The issues in Moran's claim against Snare are:
 1. Was the loss of Moran's towing gear caused by any negligence of Snare or the offering of an unseaworthy vessel for towage?
 2. Did any negligence of Moran cause or contribute to the loss?
 3. Damages, if any.

shanty, anchors and buoys. Snare also tack-welded bars across the manhole covers and installed red and green sidelights on the crane house, about 20 ft. above the deck, and about 15 ft. apart.

On September 6, 1956, the 110 was surveyed by James Wilson, employed by Atlantic Mutual Insurance Co. as a marine surveyor.

During the interval between Commander Madison's first and second inspections and prior to the arrival of the Julia on September 7th, Snare shifted the 110 from the north side of the pier to the end of the pier. The Julia arrived in Delaware City on the morning of September 7th. By this time the bars had been welded over the hatch covers on the 110 and it was not possible to examine the interior. The exterior of the hull immediately below the deck was covered by fenders. Also the equipment on deck was fastened down and could not be moved. The captain and mate of the Julia examined so much of the deck and exterior of the hull as was visible above the waterline and saw nothing in the 110's outward appearance to indicate that she could not make the tow successfully in good weather. With the aid of about ten Snare workmen a wire bridle was rigged on the bow of the 110 and a chain bridle on its stern.

The F.S.C. 112, a longer and wider barge with a greater freeboard, was also to be towed along with the 110. A chain bridle was rigged on the bow of the 112. Snare's underwriter's surveyor recommended to the Julia's captain that the 110 be towed ahead of the 112. This was the only advice or information given to the Julia's crew. They were not informed of any defect or weaknesses of either barge or advised that any special precautions would be necessary in towing her. Prior to the departure of the tow on September 7th, Commander Madison again viewed the 110 and issued a Permit to Proceed for Repairs from Delaware City to New York City.

The Julia left Delaware City at 3:00 p. m. on September 7, 1956, with the 110 facing bow first alongside the tug, and the 112 on the other side of the tug. The tug proceeded at moderate speed down the Delaware River with fair weather and a favoring tide. At 4:00 p. m. the Julia reached the area of Reedy Island in the Delaware River, where the tow was streamed. The 112 was first let go and put on 100 fathoms of intermediate hawser shackled into the chain bridles on the 112's bow and the 110's stern. The 110 was then let go and put on 100 fathoms of towing hawser shackled into the wire bridles on the 110's bow and leading from the towing winch on the Julia's stern. The tow then continued down the Delaware River, into Delaware Bay, and then emerged into the Atlantic Ocean. The weather remained fair and the sea was slight. The barges followed well behind the Julia and appeared to be all right.

At 1:40 a. m. on September 8th, the Julia's mate, who was on watch at the time, observed the riding lights of the barges. The barges were in the same condition and position as they had been prior to that time. At 1:50 a. m., when he looked back again, the 110 had capsized and sunk.

In a situation such as this, the applicable principles of law are well settled. "In a contract of towage, the owner of the tow is responsible for the seaworthiness of his vessel and the owner of the tug for its safe navigation. The Radnor, D.C.Md., 21 F.2d 982; The Lizzie M. Walker, 4 Cir., 3 F.2d 921." Curtis Bay Towing Co. of Va. v. Southern Lighterage Corp., 4 Cir., 1952, 200 F.2d 33, 34; United States Fire Ins. Co. v. Gulf States Marine & Mining Co., 5 Cir., 1959, 262 F.2d 565; The Mariner, D.C.D.Mass. 1940, 35 F.Supp. 802, 805. "The mere fact that a tow receives injury does not render the tug liable. Negligence must be affirmatively shown and the burden of proving negligence rests upon those seeking to establish liability therefor. The tug is not liable as an insurer or as a common carrier, but owes to the tow the duty to exercise such reasonable care and maritime skill as prudent navigators employ in the performance of similar serv-

ices. Stevens v. The White City, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699; 'The Margaret,' 94 U.S. 494, 24 L.Ed. 146; The Lapwing, 5 Cir., 150 F.2d 214; The Clarence L. Blakeslee, 2 Cir., 243 F. 365; The Atlantic City, 4 Cir., 241 F. 62." Stall & McDermott v. The Southern Cross, 5 Cir., 1952, 196 F.2d 309, 311; Southgate v. Eastern Transp. Co., 4 Cir., 1927, 21 F.2d 47, 49; Shamrock Towing Co. v. Schiavone-Bonomo Corp., D.C.S.D. N.Y.1959, 173 F.Supp. 39, 44. "[A] tow is presumed to be unseaworthy when she sinks under normal conditions, and in the absence of proof that she was improperly handled. The Senator Rice (D.C.) 15 F.(2d) 882; In re Young (D.C.) 162 F. 912; The Arctic Bird (D. C.) 109 F. 167". The Radnor, D.C.D.Md. 1927, 21 F.2d 982, 983; Southern Lighterage Corp. v. The J. Alvah Clark, D.C. E.D.Va., 103 F.Supp. 580, 582, affirmed Curtis Bay Towing Co. of Va. v. Southern Lighterage Corp., 4 Cir., 1952, 200 F.2d 33; The Mariner, D.C.D.Mass.1940, 35 F.Supp. 802, 805; see Commercial Molasses Corp. v. New York Tank Barge Corp., 2 Cir., 1940, 114 F.2d 248, 250, affirmed, 1941, 314 U.S. 104, 62 S.Ct. 156, 86 L.Ed. 89; Metropolitan Coal Co. v. Howard, 2 Cir., 1946, 155 F.2d 780, 783.

■ Snare contends that the barge sank as a result of a hole in the bow of the barge. It is alleged that the hole was caused by the negligence of the Julia during the course of the tow. Snare theorizes that the 110 was brought into contact either with the 112 or with the Julia during the streaming operation, thus causing the hole. After carefully reviewing all the evidence, I find that Snare has failed to sustain its burden of proving the Julia negligent.

The first question concerns the existence of the alleged hole in the 110. The evidence on this point is contradictory and confusing, to say the least. Cobelens, the diver sent down by Snare shortly after the sinking, testified that he found a hole. On the other hand, Van Frank, a salvor under contract to the Army Engineers, testified that he did not find a hole. Furthermore, the parties cannot seem to agree as to whether the hole, if there was one, was found in the starboard bow corner or the port stern corner. This confusion is understandable when one considers the fact that both ends of the barge were identically shaped.

■ In order to arrive at any conclusion concerning this alleged hole, the testimony of Cobelens and Van Frank must be considered. Neither man's evidence can be accepted in its entirety due to the infirmities in both their testimonies. Both left much to be desired in terms of clarity, consistency and coherence. Cobelens was hired by Snare. His inspection of the barge was made at Snare's behest without the presence of any representative from Moran. Such secret inspections for the purpose of obtaining evidence for a litigation have been frowned upon by courts of Admiralty and they are accorded diminished weight. See The Westchester, 2 Cir., 1918, 254 F. 576, 578; Patton-Tully Transp. Co. v. Barrett, 6 Cir., 1930, 37 F.2d 516, 519; The Evansville-Marblehead, D.C.E.D.N.Y.1940, 1941 A.M.C. 62, 64–65; The Cristobal Colon, D.C.S.D. N.Y.1929, 36 F.2d 825. Furthermore, Cobelens' dive was of comparatively short duration and he admitted confusion in distinguishing bow from stern. Moreover, the sketchiness of his contemporaneous notes and the inconsistencies between his testimony given before the Coast Guard in October of 1956 and his testimony at trial make acceptance of his version most difficult. Van Frank's testimony was similarly of little aid in shedding light on the problem. Although he was not employed by either party, his view of the barge took place some nine months after she went down. During the time she lay on the bottom, the 110 was subject to the surging of the waters, which if sufficient to wear out some of Van Frank's equipment, could certainly have affected the condition of the barge. And some of the leaks testified to could just as easily have resulted from the strains of attempting to raise the barge as from any prior existing condition. From the state of the record, absent any

speculation or conjecture, I am unable to arrive at any conclusion as to whether or not a hole existed in the 110 when she went down.

Assuming, arguendo, that a hole was found in the rake section of the barge by Cobelens, Snare still has failed to sustain its burden of proving that the hole was caused by the negligence of the Julia. Snare has adduced no proof of any specific act of negligence on the part of the tug. It is not claimed that the tug performed any operation improperly or that she failed to do something that should have been done. It is not now contended that the speed of the tug was excessive or that there was a failure to keep a proper lookout. The makeup of the tow is not criticized. In fact, the manner of towing, the 110 in the lead and the 112 following, was suggested by Snare's underwriter prior to departure.

All that Snare can offer is the hypothesis that the 110 was brought into sharp contact with either the 112 or the Julia. In contrast, the testimony of the captain and mate of the Julia is uncontradicted that there was no contact between the 110 and either the Julia or the 112 during the streaming operation.

Snare urges that the failure of Moran to call Connally, a sailor who was aboard the 110 during part of the streaming operation, or to explain his absence justifies an inference that if called his testimony would be adverse to Moran. To the contrary, there is the uncontradicted testimony of the captain and mate that no contact occurred, the uncontradicted and unquestioned method of streaming which was used and the explanation of the captain that Connally is no longer in Moran's employ and that he does not know where he is. Thus, on the record as a whole, even the unfavorable inference would not be enough to tip the scales in favor of Snare.

Furthermore, the theory of contact between the 110 and the 112 ignores the freeboard of the two vessels. Since the freeboard of the 112 was substantially higher than that of the 110, it would have been virtually impossible for a corner of the 112 to have gotten under the guard of the 110 to make a hole in its rake section unless the two barges were riding close together in rough seas. The evidence is uncontradicted that the sea was slight. And the two barges were not riding close together at any time. Prior to the streaming, they were on opposite sides of the tug, and after the streaming they were separated by 600 feet of hawser. Although it is not claimed by Snare that the Julia brought the 110 into contact with the pier at Delaware City, that possibility can be disposed of easily. It is reasonable to infer that had any damaging contact occurred there, some testimony would have been forthcoming from at least one of the many persons who were present and witnessed the departure of the tow. Thus, the only remaining possibilities are that the hole existed prior to the arrival of the Julia or that it was caused while the barge was sinking or after she had gone down. Neither of these possibilities can confer liability on the tug for the sinking of the barge.

Snare argues that this case should be governed by the rule of res ipsa loquitur and attempts to distinguish Stevens v. White City, 1932, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699. In that case, a vessel was delivered for towing. Upon arrival at the end of the tow, the vessel's hull planking was found to be damaged. The Court held that the mere fact that the tow was in good order when received by the tug and in damaged condition when delivered did not raise a presumption of negligence. "The burden of proof as to respondent's negligence remained upon petitioner throughout the trial. His contentions clearly show that the evidence leaves the time, place, and cause of the injury in the realm of conjecture. The evidence is consistent with an hypothesis that the tug was not negligent and with one that it was, and therefore has no tendency to establish either." 285 U.S. at pages 203–204, 52 S.Ct. at page 350. Snare contends that the case is distinguishable because the towed vessel remained under the control of the owner,

for an employee of the owner was aboard during part of the tow. The Court was very careful to point out, however, that a towage contract does not vest in the tug the control of a bailee or common carrier. "The owner of the *Drifter* did not surrender to respondent any right of control that does not pass in virtue of a contract merely for towage. The fact that the man put aboard by the builder did not remain to the end or that the owner did not choose to keep some one on the tow is immaterial." 285 U.S. at page 201, 52 S.Ct. at page 349. The principles of law enunciated in White City are particularly apposite here.

■ Whether the doctrine of res ipsa loquitur is compatible with the principle that there is no presumption of negligence in a towage case would only have to be decided in a proper res ipsa case. This, however, is not such a case. For even accepting the doctrine as advocated by Snare, all res ipsa would require here is that the tug explain or rebut. The uncontradicted testimony of the captain and mate, the description of the streaming operation and the different freeboards of the 110 and 112 are more than sufficient by way of explanation. Moreover, it would require that Snare show that the accident was one that could not occur in the absence of the tug's negligence and that the barge was in good order when delivered. This it has failed to do. The foregoing discussion has demonstrated that the alleged hole could have resulted from a cause unconnected with any negligence of the tug. Turning to an examination of the condition of the barge when delivered, Snare has failed to show that the barge was in good order.

■ One who offers a vessel for towing holds her out as "sufficiently staunch and strong to withstand the ordinary perils to be encountered on the voyage. If she be unseaworthy by reason of weakness, decay or leaks and such defects are not obvious to the master of the tug he will be absolved from responsibility where such unseaworthiness causes the damage complained of." The Edmund L. Levy, 2d Cir., 1904, 128 F. 683,

684; Southgate v. Eastern Transp. Co., 4 Cir., 1927, 21 F.2d 47; A. S. Wikstrom, Inc. v. The Julia C. Moran, D.C.S.D. N.Y.1960, 190 F.Supp. 250, 251; The Rondout, D.C.E.D.N.Y.1944, 53 F.Supp. 736, 738; The Morning Star, D.C.S.D. N.Y.1926, 10 F.2d 538. Realizing that it had a duty to furnish a seaworthy barge, Snare attempts to rebut the presumption of unseaworthiness arising out of the circumstances of the sinking by urging the testimony of Wilson, the underwriter's surveyor, the testimony of the captain and mate of the Julia and the testimony of Commander Madison. It is Snare's contention that they inspected the tug and found her seaworthy. An examination of their testimony, however, shows that the conclusion Snare attempts to draw cannot be sustained.

James Wilson, employed by Atlantic Mutual Insurance Company as a marine surveyor, surveyed the 110 on September 6, 1956. He looked over the outside of the barge, but did not go into the interior. Whether this was due to the fact that the bars had already been welded over the hatches is not ascertainable from the evidence. In any case, he accepted the statement of the Snare workmen as to conditions below decks. Wilson said he saw no hole anywhere along the outside of the vessel. But since he did not go into the interior of the barge he could not tell what was the condition of the hull below the waterline. Also he could not tell what was the condition of the plates below the iron guards and the wooden strips of the bow and stern because they were already in place. It is unclear from Wilson's description how much of the rake section he was able to see. The physical factors, including the freeboard of the vessel and where he was standing make it unlikely that he was able to see much of it. Thus, Wilson's testimony boils down to his conclusion that there was nothing wrong with what he saw. But the problem for Snare is that there was a substantial part of the vessel which he did not see.

When the Julia arrived on September 7, Captain Chapman, her master, went

aboard the 110 and examined her. His examination was limited to the deck and the outside of the hull for a distance of about 18″ from the deck to the water. Everything on deck was welded down and closed up so that he was unable to inspect the interior of the vessel. He saw no hole and found everything he was able to examine in good order. He was told of no difficulties or weaknesses of either the 110 or the 112 with the exception of a recommendation to tow the 110 first, because she would not follow straight and would swing from side to side if towed in tandem or astern of the 112.

The testimony of Dexter, the mate, was substantially to the same effect. He went on board the 110 to rig the towing gear. He saw no visible damage on the outside of the vessel, but was unable to see the interior which was closed up. The freeboard was 18″ and Dexter was unable to see more than one or two inches of the rake section. The barge was heavily laden and the waterline was about an inch below the top of the rake section.

 It is thus clear that the inspection made by the captain and the mate were limited in scope and establish no more than that they did not observe anything in the vessel's outward appearance which would indicate that she could not make the tow in good weather. Their inspection in no way relieved the barge from her warranty of seaworthiness. A. S. Wikstrom, Inc. v. The Julia Moran, D.C.S.D.N.Y.1960, 190 F.Supp. 250, 251.

On September 4, 1956, in response to a request made to the Marine Inspection Office of the Coast Guard for a Certificate of Inspection, Commander Madison was detailed to inspect the F.S.C. 110. He examined both the interior and exterior of the vessel and found the condition poor enough not to recommend the issuance of the Certificate. Specifically, the exterior of the shell plating was very much indented in many places, as were the fender straps along the side and the bow. The wooden fenders were splintery in appearance, but they were not loose. The interior on the shell plating of the vessel was very scaly, rusty, especially so down toward the bilge. The four transverse bulkheads, the frames and the brackets were in the same poor condition. The deck beams were not quite as poor as the frames and bulkheads in that they were not quite as colored with rust as the other items. Commander Madison was unable to tell the condition of the keelson since it was covered by a layer of concrete. The manholes, which were flush with the deck, could not be fastened down to make them watertight due to the lack of some gaskets and deterioration of others. Commander Madison concluded that the barge was quite a bit below the minimum standards for a seagoing barge.

In order to qualify the 110 for a Certificate of Inspection, she would have had to be drydocked and extensive work would have had to be done on her. In the condition she was in, there was no way to determine how much thickness of the shell plating was left. It would have been necessary to examine the underwater plating, to clean off the scale and measure the thickness of the plates so as to determine how much had rusted away, and to replace the plates found to have become deteriorated. It would also have been necessary to check the frames and knees and to replace those strength members which had deteriorated. Commander Madison informed a representative of Snare of his findings and reported them to his superior to decide what would be done.

When it was decided that a Permit to Proceed for Repairs would be issued, Commander Madison required certain work to be done to qualify for this lesser document. He recommended tackwelding bars across the manholes in order that they not be taken off by sea water washing up on deck, securing all loose gear and rigging sidelights. When Commander Madison returned on September 7, 1956, he found that those three operations had been done. He was unable to go inside the vessel since the bars over the manholes were already in place although he had not expected them to be. And he was unable to test the strength of the weld without breaking it. Al-

though Commander Madison had seen the entire rake on the inside during his September 4th inspection, he was unable to see any of it when he returned on September 7th. And he was able to see very little of the outside of the rake because the 110 was riding deep in the water. There is nothing in the evidence which would indicate that any attempt was made to correct, even temporarily, any of the interior conditions which Commander Madison observed on September 4th.

A Permit to Proceed for Repairs from Delaware City to New York was issued to the 110. The significance of this document was the subject of extensive questioning by the court and argument of counsel. Commander Madison explained that a Permit to Proceed "merely infers the bare minimum standards of departure from one place to another, and we usually issue those to vessels when they want to go some place to undertake work which cannot be undertaken in the port where they are located. They may be damaged in a collision and then they want to go to another place for drydock and repairs and we will issue a permit to proceed. *That doesn't mean that it is seaworthy in any respect but safe enough to undertake this short journey.*" Trial minutes at 124 (emphasis added). In

order to get the permit, the Commander stated that the vessel had to be made "a little bit more seaworthy than I found her." Trial minutes at 114. When that was done, "she would have a fairer chance of arriving safely. * * *" Ibid. On September 7, 1956, it was Commander Madison's opinion that the barge was in a fit condition to be towed to New York, and a Permit to Proceed for Repairs was issued.

 Moran argues that the acquisition by Snare of the Permit to Proceed does not rebut the presumption of unseaworthiness. It is contended that the 110 was required to have a Certificate of Inspection. 46 U.S.C. § 395, 46 U.S.C.A. § 395 provides for the inspection of seagoing barges of 100 gross tons or over and the issuance of Certificates of Inspection for seagoing barges.[2] The statute itself does not define the term seagoing barge.[3] However, the Coast Guard regulation, enacted April 18, 1956, provides that the requirement of certification extends to every nonself-propelled vessel of 100 gross tons and over which proceeds on a voyage between two domestic ports via the high seas or ocean.[4] The 110 came within that class of vessels required to obtain a Certificate of Inspection. See United States v. Gahagan

2. "§ 395. Seagoing barges; hulls and equipment * * *.
 "(b) Biennial inspection of barges over 100 tons not carrying passengers.
 "The head of the department in which the Coast Guard is operating also shall require the Coast Guard to inspect, before the same shall be put into service and at least once in every two years thereafter, the hull and equipment of every seagoing barge of one hundred gross tons or over, not carrying passengers; and to determine to its satisfaction that such barge is of a structure suitable for the service in which she is to be employed, has suitable accommodations for the crew, if manned, and is in a condition to warrant the belief that she may be used in navigation with safety to life.
 "(c) Certificate of inspection.
 "Upon the satisfactory completion of the inspection authorized herein, a certificate of inspection shall be issued in the manner and for the purposes prescribed in

sections 399 and 400 of this title. May 28, 1908, ch. 212, § 10, 35 Stat. 428; 1946 Reorg.Plan No. 3 §§ 101–104, eff. July 16, 1946, 11 F.R. 7875, 60 Stat. 1097; June 4, 1956, ch. 350, § 3, 70 Stat. 225."

3. Snare cites the definition of seagoing barge contained in 46 U.S.C. § 672c(2), 46 U.S.C.A. § 672c(2). That definition appears in the portion of Title 46 relating to Merchant Seamen and is only applicable to §§ 643a, 660b and 672b of Title 46, U.S.C. §§ 643a, 660b, and 672b of 46 U.S.C.A.

4. "If a nonself-propelled vessel (100 gross tons and over), whether or not designed for seagoing or ocean service, proceeds on a voyage to a foreign port via the high seas or ocean, or proceeds on a voyage between two domestic ports via the high seas or ocean, such vessel will be subject to inspection and certification as a seagoing barge" 21 Fed.Reg. 2521, 46 C.F.R. § 90.05–25(b).

Dredging Corp., 2 Cir., 1961, 289 F.2d 639, affirming D.C.S.D.N.Y.1960, 24 F. R.D. 328. In its trial memorandum Moran argued that the failure to obtain the certificate is a statutory fault imposing on the violator the heavy burden of proving that the violation could not have contributed to the loss. See The New York Marine No. 10, 2 Cir., 1940, 109 F.2d 564, 566; Carr v. Hermosa Amusement Corp., 9 Cir., 1943, 137 F.2d 983, 987–988, certiorari denied 1944, 321 U.S. 764, 64 S.Ct. 520, 88 L.Ed. 1060. The loss sustained here is the sort that the inspection requirement was intended to prevent. In the recent decision of United States v. Gahagan Dredging Corp., supra, the Court of Appeals interpreted the inspection requirement as intending the protection of property as well as life which is endangered by the unseaworthiness of vessels required to be inspected. "The dangers which § 10 [46 U.S.C. § 395] guards against exist on a barge's first voyage to sea and on all subsequent ones whether the voyages are rare or frequent. A requirement that every barge over 100 gross tons be inspected before being utilized in 'seagoing' trips insures that the policy Congress enunciated will be thoroughly enforced." 289 F.2d at page 642. Based upon all the evidence, Snare has failed to sustain its burden.

From the issuance of the Permit, Snare would have the court infer that the barge was seaworthy. But the testimony of Commander Madison makes clear the very limited purpose of the Permit. In addition, the regulations and the text of the Permit itself, set out in the margin, indicate that the issuance of the Permit is limited to proceeding for repairs.[5] And while a Certificate of Inspection is valid for a period of two years, the Permit to Proceed must be surrendered at the next port. "Certificates of surveyors and inspectors are to be valued in the light of what the actual facts disclosed. The Vestris (D.C.) 60 F.(2d) 273. See, also, Bank Line v. Porter, 25 F.(2d) [843,] 845 (C.C.A.4); The Abbazia (D.C.) 127 F. 495; The Negus (D.C.) 298 F. 749." The Doris Kellogg, D.C.S.D.N.Y.1937, 18 F.Supp. 159, 168, affirmed In re Kellogg S. S. Corp., 2 Cir., 1938, 94 F.2d 1015. The significance of the Permit must be considered in light of the conditions found by Commander Madison. It is difficult to comprehend how a vessel which is in need of repair and is considered below the minimum standards for a seaworthy barge can use the very document which permits it to travel for the limited purpose of accomplishing those repairs as evidence of seaworthiness. The sounder argument on these facts is to the contrary; that the refusal to issue the Certificate of Inspection is strong evidence of unseaworthiness.

In addition to relying on the presumption of unseaworthiness which Snare has failed to rebut, Moran urges that the barge was in fact unseaworthy in three respects. First, it is contended that the interior conditions, as found by Commander Madison, were in a state of decay

---

5. "The Officer in Charge, Marine Inspection, may issue a permit to proceed to another port *for repair*, Form CG 948, to a vessel, if in his judgment it can be done with safety, even if the certificate of inspection of the vessel has expired or is about to expire." 46 C.F.R. § 91.05–1(a) (emphasis added).

Form CG 948 as issued to the 110 (exhibit 1) reads: "The S.S/M.V. Derrick Barge FSC No. 110 of ————, in the State of ———— ON Undocumented, whereof Unmanned is Master, has been examined and inspected this date and I find that the said vessel is requiring repairs, to wit:

"Permitted to proceed from Delaware City, Del. to New York, N.Y., unmanned, in tow, for the purpose of making repairs.

"The said Master requesting that the said vessel be permitted to proceed to the port of New York, New York, for the purpose of making the said repairs, I do hereby, after due consideration, regarding it as safe to do so, permit her to proceed to said port, touching at intermediate ports in her course, as if she had, in every particular, complied with the requirements of law." (Underlinings indicate material typed onto the form by the Coast Guard.)

and deterioration; second, the manholes in the deck were not watertight; and third, the barge apparently lacked stability. The first condition has been fully explored above. As to the manhole covers, Commander Madison found that they were not watertight and that new gaskets were needed. Moran contends that although the Commander permitted the expedient of tackwelding bars, the work was done by Snare's employees and there was no way of testing the strength of the weld. Van Frank's testimony is relied upon to confirm the fact that the welding was poorly done. The difficulty in accepting Van Frank's testimony on this point has been discussed above. Concerning the alleged instability of the 110, Moran admits that it is unable to prove that the barge was unstable. This is due, in part, to the fact that no stability tests were ever made on the 110. Snare's method of testing stability apparently was to load the barge as she had been loaded on her last voyage. But on this ill fated voyage, the 110 carried a boom and shanty which were not aboard when she arrived at Delaware City. Moran also urges that the failure to fill the fresh water tank in the hull of the barge contributed to the 110's instability.

None of the three factors urged, if taken alone, is sufficient to prove the barge unseaworthy. They do, however, raise questions as to the barge's seaworthiness which Snare has failed to explain. When taken together with all of the evidence, including the presumption and the failure to obtain the Certificate of Inspection, the court is left with the conclusion that the F.S.C. 110 was unseaworthy.

In conclusion, Snare has failed to sustain its burden of proving that the loss of the barge was due to any negligence of Moran. The best that can be said for Snare is that its proof leaves the question of negligence in the realm of conjecture. Snare has also failed to prove that it offered a seaworthy barge for towage. Moran is entitled to a decree dismissing the libel of Snare. Moran is also entitled to a decree on its libel holding Snare liable for the loss of the Julia's towing gear.

The foregoing opinion shall constitute the Findings of Fact and Conclusions of Law in accordance with Supreme Court Admiralty Rule 46½, 28 U.S.C.A.

Decree accordingly.